FILED
COURT OF APPEALS
DIVISION II

2013 JUL -2 AM 9: 04

STATE OF WASHINGTON
BY_____
            DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Detention of<br><br>DARNELL McGARY,<br><br>                      Appellant. | No. 42552-1-II<br>(Consolidated with No. 42871-7-II)<br><br><br><br>PUBLISHED OPINION |
| In re Personal Restraint Petition of<br><br>DARNELL McGARY,<br><br>                      Petitioner. | |

QUINN-BRINTNALL, P.J. — Darnell McGary appeals the 2011 jury verdict upholding his commitment as a sexually violent predator (SVP). He argues that (1) the trial court erred by excluding actuarial evidence regarding his chances of recidivism, (2) the prosecutor committed misconduct at closing argument, and (3) cumulative error denied him the right to a fair trial.

In his consolidated personal restraint petition (PRP), McGary argues that the State should be precluded from arguing that he satisfied the SVP criteria based on mental disorders other than

those addressed in a 2004 stipulation and that the State has not proven that he currently suffers from a mental disorder. We affirm the commitment order and deny the PRP.

FACTS

McGary pleaded guilty to three violent sex offenses that occurred in 1987 and 1988: two counts of first degree rape and one count of indecent liberties by forcible compulsion. McGary was incarcerated for these crimes. In 1992, McGary attempted to force a fellow inmate into sexual activity. McGary began to manifest symptoms of schizophrenia in 1994, while still incarcerated.

At the end of McGary's sentence in 1998, the State petitioned to have him committed as an SVP.[1] McGary was transferred to the Special Commitment Center (SCC) pending trial on the SVP petition. McGary ultimately stipulated to commitment as an SVP in February 2004. McGary stipulated that he suffered from schizophrenia and antisocial personality disorder, and that his personality disorder made him more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility.

In December 2004, McGary filed a PRP alleging that the State breached the stipulation by confining him for a disorder (paraphilia) to which he did not stipulate. After the Supreme Court transferred his petition to this court, we dismissed it because there was no evidence that the State was in breach of the agreement.

---

[1] Washington law defines an SVP as "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18). We cite the current version of the statutes because the SVP definition has not changed since the State filed its petition.

2

In 2010, SCC forensic evaluator Dr. Megan Carter conducted McGary's annual review and determined that he no longer met the criteria for commitment as an SVP. McGary moved for dismissal of the commitment order requiring his confinement as an SVP. In accordance with RCW 71.09.090, the superior court granted McGary a trial to determine whether he was entitled to unconditional release into the community.

McGary filed a pretrial motion to dismiss, or, in the alternative, to bar evidence of any new diagnoses not referenced in his 2004 stipulation that might prevent his release, based on principles of collateral estoppel or issue preclusion. The trial court denied the motion.

The State filed a pretrial motion to preclude McGary's expert, Dr. Richard Wollert, from testifying about the MATS-1 actuarial instrument he had recently developed. The State argued that the MATS-1 test was inadmissible under ER 703 because it was not reasonably relied upon by experts in the field. The State attached unpublished orders of several superior courts that had found Wollert's testimony generally unreliable. The trial began without a hearing on this motion.

The State called several witnesses to testify about McGary's mental diagnoses and his danger of reoffense. The State first called Dr. Brian Judd, who was McGary's sex offender treatment provider in 2004 and 2005. Judd testified that McGary's diagnoses of paraphilia NOS (nonconsent),[2] personality disorder, and schizophrenia are long-term conditions. SCC psychiatrist Dr. Leslie Sziebert, who is treating McGary for his schizophrenia, testified that he was part of the senior clinical team that disagreed with Dr. Carter's conclusion that McGary no longer meets the SVP criteria. Dr. Sziebert's concern was that McGary would not take his

---

[2] This is a chronic disorder that, in McGary's case, involves intense urges to engage in sexual encounters with nonconsenting females.

antipsychotic medications if released. He described a violent confrontation between McGary and a staff member that occurred in 2005 when McGary was not taking antipsychotic medications.

Psychologist Les Hutchens testified that he treated McGary at the SCC from 2009-2010. McGary did not succeed in his treatment group because he believed he had completed treatment and was ready for release. The State also called Dr. Steven Marquez, who concluded after evaluating McGary in 2010 that his condition had not changed such that he would recommend McGary's release into the community.

The State then called Dr. Douglas Tucker, who also evaluated McGary in 2010. Tucker diagnosed McGary with five mental disorders: paraphilia NOS (nonconsent), schizophrenia, alcohol dependence, cannabis abuse, and antisocial personality disorder. Tucker concluded that based on these disorders, McGary continues to meet the definition of an SVP.

Dr. Tucker also scored McGary's risk of recidivism using three actuarial tests: the Static-99R, the Static-2002R, and the MnSOST-R. Tucker gave McGary a score of seven on the Static-99R, giving him a 37.9 percent chance to reoffend within five years and a 48.6 percent chance to reoffend within ten years. Tucker gave McGary a seven on the Static-2002R as well, which corresponded to a 29.3 percent chance to reoffend within five years and 40 percent within ten years. Finally, Tucker gave McGary a score of sixteen on the MnSOST-R, corresponding to an 88 percent chance of reoffending within six years. Based on all of these instruments, Tucker testified that McGary was in the moderate high to high risk category to reoffend.

Dr. Tucker also evaluated McGary under the PCL-R test, which evaluates an offender's level of psychopathy. Tucker gave McGary a 32.2, which was a very high score. Tucker concluded that McGary was likely to commit rape or attempted rape if not confined.

4

McGary then called Dr. Carter, who also gave McGary a seven on the Static-99R, although she testified that McGary no longer met the criteria as an SVP.

Before the defense called Dr. Wollert, the State requested a hearing on its motion to exclude his proposed testimony about the MATS-1 actuarial instrument. The trial court allowed the parties to voir dire Wollert outside the presence of the jury. Wollert testified during voir dire that there was nothing novel about his approach to developing the MATS-1, but he added that he knew of only six experts nationwide who had used the MATS-1 since its publication in November 2010.

Dr. Wollert did not explain how he would have scored McGary on the MATS-1, but he did testify that for someone McGary's age, the highest chance of recidivism possible under the test would have been 25.5 percent. The trial court ruled that the MATS-1 was not the type of test reasonably relied on by experts in the field and excluded it under ER 703.

During his testimony before the jury, Dr. Wollert testified that he scored McGary using the Static-99R test. He gave McGary a seven when including the 1992 prison incident, but a score of three without it. Because there were uncertainties regarding the 1992 incident, Wollert believed that McGary's chances of recidivism should take both scores into account. Wollert also evaluated McGary under the PCL-R and gave him a score of 23, which is the average for prison offenders. He admitted during his direct examination that he had scored McGary on this test the previous day. Finally, Wollert evaluated McGary using the Static-2002R. He gave McGary a five on the Static-2002R when including the 1992 incident, and a four when excluding it. On cross-examination, Wollert acknowleged that he had scored McGary on the Static-2002R the day before, and the State asked about the timing of his PCL-R scoring as well.

During closing argument, the State briefly addressed Dr. Wollert's late scoring of the Static-2002R and PCL-R tests:

> You heard Dr. Wollert got this case about two-and-a-half years ago. When did he score the PCL-R? Tuesday night. When did he score the Static-2002R? Last night. We had his reports. [The State] deposed him awhile back to find out what his opinions would be, and then he sandbagged us. He came in, and he did those things days before he testified without us knowing about it. We found out when you found out when he testified, and we got sand all in our hair. That happens sometimes in courtrooms. We just pick up and move on. That was not right. It wasn't right.

8 Report of Proceedings (RP) at 1142-43.

The jury found that McGary continued to meet the definition of an SVP, and the trial court issued an order continuing his SCC commitment. Approximately two months after the verdict, McGary filed a motion for summary judgment that was apparently based on an earlier habeas corpus petition he had filed in the superior court.[3] That court transferred McGary's motion here for consideration as a PRP, and we consolidated the petition with McGary's appeal of the commitment order.

## ANALYSIS

### EXPERT TESTIMONY AND THE MATS-1 ACTUARIAL INSTRUMENT

McGary argues that the trial court erred by excluding the MATS-1 because it was admissible under ER 703. The State responds that McGary failed to preserve this issue with an adequate offer of proof, that the MATS-1 was inadmissible under both ER 702 and ER 703, and that any error in excluding this evidence was harmless.

We review evidentiary rulings for abuse of discretion. *State v. Lormor*, 172 Wn.2d 85, 94, 257 P.3d 624 (2011). A trial court abuses its discretion if it relies on unsupported facts,

___

[3] That petition is not part of our record.

applies the wrong legal standard, or adopts a position no reasonable person would take. *State v. Lord*, 161 Wn.2d 276, 284, 165 P.3d 1251 (2007). We may affirm the trial court on any basis the record supports. *LaMon v. Butler*, 112 Wn.2d 193, 200-01, 770 P.2d 1027, *cert. denied*, 493 U.S. 814 (1989).

### A. ISSUE PRESERVATION

The State argues initially that McGary has not preserved his objection to the trial court's exclusion of the MATS-1 because he failed to make a detailed offer of proof.

Under ER 103(a)(2), error may not be predicated on a decision to exclude evidence unless "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." The substance of an offer of proof need not be made known in detail. *State v. Ray*, 116 Wn.2d 531, 539, 806 P.2d 1220 (1991). Rather, the substance of the evidence may be made apparent from the questions asked or from the context in which they were asked. *Ray*, 116 Wn.2d at 539.

Here, the substance of Dr. Wollert's testimony was adequately disclosed, even though he did not testify exactly what score McGary received on the MATS-1 or exactly how that score would have affected the assessment of his risk of recidivism. Wollert did testify that, given McGary's age, his maximum rate of recidivism under the MATS-1 would be 25.5 percent. Consequently, the potential significance of Wollert's testimony was disclosed: the MATS-1 would have predicted McGary's chances of recidivism as lower than the tests performed by the other experts. McGary thus preserved his objection to exclusion of the MATS-1.

### B. ER 702 AND ER 703

The State argues further that evidence concerning the MATS-1 was inadmissible under ER 702 and ER 703.

Actuarial instruments are often used in SVP trials to aid in the prediction of an offender's future dangerousness. *See, e.g.*, *In re Det. of Thorell*, 149 Wn.2d 724, 753, 72 P.3d 708 (2003), *cert. denied*, 541 U.S. 990 (2004); *In re Det. of Robinson*, 135 Wn. App. 772, 786, 146 P.3d 451 (2006), *review denied*, 161 Wn.2d 1028 (2007). As the Supreme Court explained in *Thorell*,

> The actuarial approach evaluates a limited set of predictors and then combines these variables using a predetermined, numerical weighting system to determine future risk of reoffense which may be adjusted (or not) by expert evaluators considering potentially important factors not included in the actuarial measure.

149 Wn.2d at 753.

Actuarial instruments are not novel scientific evidence requiring a *Frye* hearing and de novo review. *Thorell*, 149 Wn.2d at 755; *see Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923) (standard for admitting novel scientific theory or principle is whether it has achieved general acceptance in the relevant scientific community). Rather, actuarial instruments are analyzed as an aid to expert testimony under ER 702 and ER 703. *Thorell*, 149 Wn.2d at 755-56.

ER 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." To admit expert testimony under ER 702, the trial court must determine that the witness qualifies as an expert and that the testimony will assist the trier of fact. *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 918, 296 P.3d 860 (2013).[4]

---

[4] There is some disagreement in Washington cases concerning the proper standard to apply under ER 702. Some courts apply the two-part test set forth in *Lakey*, while others apply a three-part test that includes a consideration of whether the expert testimony is generally accepted in the scientific community. *See, e.g.*, *State v. Cheatam*, 150 Wn.2d 626, 645, 81 P.3d 830 (2003); *State v. McPherson*, 111 Wn. App. 747, 761, 46 P.3d 284 (2002). The "general acceptance" consideration is clearly based on *Frye*. *State v. Cauthron*, 120 Wn.2d 879, 890 n.4, 846 P.2d 502 (1993). Given the *Thorell* holding that the *Frye* standard does not apply to the admissibility of

The *Lakey* court compared the tests for admissibility under ER 702 and *Frye*: "*Frye* excludes testimony based on novel scientific methodology until a scientific consensus decides the methodology is reliable; ER 702 excludes testimony where the expert fails to adhere to that reliable methodology." 176 Wn.2d at 918-19. Unreliable testimony does not assist the trier of fact and is properly excluded under ER 702. *Lakey*, 176 Wn.2d at 918.

The trial court may consider questions related to reliability under the "helpfulness to the jury" standard of admissibility. *State v. Copeland*, 130 Wn.2d 244, 259, 922 P.2d 1304 (1996). The trial court's conclusions regarding helpfulness will depend on its evaluation of the state of knowledge presently existing about the subject of the proposed testimony and its appraisal of the facts of the case. *State v. Riker*, 123 Wn.2d 351, 364, 869 P.2d 43 (1994). The trial court has broad discretion in determining whether an expert's testimony is admissible under ER 702. *Philippides v. Bernard*, 151 Wn.2d 376, 393, 88 P.3d 939 (2004); *State v. Rafay*, 168 Wn. App. 734, 783, 285 P.3d 83 (2012), *review denied*, 176 Wn.2d 1023 (2013).

ER 703 provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." If those facts or data are of "a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," the facts or data need not be admissible in evidence. ER 703. Because ER 703 is concerned with the trustworthiness of the resulting opinion, the trial court should not allow the opinion if the expert can show only that he customarily relies on such material and if the data are relied on only in preparing for litigation. *State v. Nation*, 110 Wn. App. 651, 663, 41 P.3d 1204 (2002), *review denied*, 148 Wn.2d 1001

---

actuarial instruments and the *Lakey* explanation of the differences between the *Frye* test and the two-part test for admissibility under ER 702, we apply the two-part test set forth in *Lakey*.

(2003). "The proponent of the testimony must show that experts in the witness's field, in general, reasonably rely upon such material in their own work; *i.e.*, for purposes other than litigation." 5D KARL B. TEGLAND, COURTROOM HANDBOOK ON WASHINGTON EVIDENCE, Rule 703 cmt. at 391 (2012-13 ed.). The word "reasonably" in ER 703 gives trial courts discretion in determining whether the underlying information is sufficiently reliable to form the basis of an expert's opinion. 5B KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE, § 703.2 at 226 (5th ed. 2007).

Dr. Wollert's status as an expert is not at issue here. The question is whether his MATS-1 test is based on a reliable methodology that is generally relied upon by experts in his field. In *Lakey*, the Supreme Court upheld exclusion of expert testimony under ER 702 because the expert failed to follow a reliable methodology. 176 Wn.2d at 920. The trial court's exclusion of Wollert's proposed testimony was proper for the same reason.

In his offer of proof, Dr. Wollert testified that he had published an article concerning the MATS-1 test in November 2010, just 10 months earlier. He explained that he developed the test by taking six items from the Static-99 "plus age." 7 RP at 837. Wollert knew of six other experts who had used the MATS-1 test since its publication; before that, no one had used it. Dr. Wollert did not know whether the six experts testified exclusively for the defense, but he believed they all belonged to the Sex Offender Crime Defense Association. Wollert did not know how frequently the other experts had used the MATS-1 or whether they had used it in conjunction with widely accepted other actuarial instruments. He explained that the MATS-1 test is "state of the art." 7 RP at 840. McGary's counsel conceded in argument that use of the MATS-1 "isn't common." 7 RP at 861.

10

There are no published state or federal appellate court decisions referring to the MATS-1 test.[5]

The trial court was fully aware of the limited state of knowledge concerning the MATS-1 test and decided against its admission because it had been used by only six experts other than Dr. Wollert, its creator. The decision to exclude Wollert's testimony about the MATS-1 actuarial instrument was not manifestly unreasonable under ER 702. *See State v. Cheatam*, 150 Wn.2d 626, 652, 81 P.3d 830 (2003) (even where the relevance and helpfulness of expert witness testimony is debatable, there is no error if the decision to exclude is based on tenable grounds). Wollert's opinion about McGary's risk of recidivism under the MATS-1 test was unreasonable under ER 703 because the court found that the test was not reasonably relied upon by experts generally and thus not sufficiently reliable to support that opinion.

C.    HARMLESS ERROR

Even if the trial court did err in excluding the MATS-1, this error was harmless. Evidentiary error warrants reversal only when there is a reasonable probability that the error materially affected the outcome at trial. *In re Det. of West*, 171 Wn.2d 383, 410, 256 P.3d 302 (2011). Both Dr. Wollert and Dr. Carter testified that they assessed McGary's chances of recidivism at below 50 percent using other actuarial tests and both concluded that McGary did

---

[5] A New York trial court recently observed that while this actuarial instrument may "end up becoming the gold standard for actuarial risk assessment instruments," the MATS-1 cannot currently be relied on to predict sex offender risk because it is the subject of ongoing research, is not commonly used and accepted, and was derived from the Static-99, which is "the most commonly used actuarial risk assessment instrument in use in the world today." *State v. Suggs*, 32 Misc. 3d 1206(A), 932 N.Y.S. 2d 763, 2011 WL 2586413, at *22 (N.Y. Sup. Ct. 2011), *aff'd on other grounds*, 104 A.D.3d 511, 960 N.Y.S. 2d 427 (N.Y. App. Div. 2013).

not meet the criteria for commitment as an SVP. The record does not reflect any reasonable possibility that admitting yet another actuarial test would have materially affected the trial's outcome.

But McGary argues that because the exclusion of the MATS-1 required Dr. Wollert to prepare some of his actuarial testing just prior to his testimony, and because the State attacked Wollert's testimony on this basis during his cross-examination and during closing argument, exclusion of the MATS-1 was prejudicial. We note initially that the State filed its motion to exclude the MATS-1 test on August 5 and that Wollert did not testify until August 17. Wollert scored McGary on the PCL-R the day before he testified and before the MATS-1 test was excluded, and he scored McGary on the Static-2002R on the evening before his cross-examination and after the MATS-1 test was excluded. It is unclear why the exclusion of the MATS-1 required this testing sequence. We reject McGary's claim of prejudice, particularly where his own attorney introduced the subject of timing and where he did not object to the cross-examination or argument at issue. *See State v. Swan*, 114 Wn.2d 613, 661, 790 P.2d 610 (1990) (failure to object strongly indicates statement did not appear prejudicial when made), *cert. denied*, 498 U.S. 1046 (1991).

PROSECUTORIAL MISCONDUCT

McGary makes the related claim that the State committed prosecutorial misconduct by referring to Dr. Wollert's late preparation of the Static-2002R and the PCL-R during his cross-examination and during closing argument.

To establish prosecutorial misconduct, the defendant must establish that the prosecutor's conduct was improper. *State v. Emery*, 174 Wn.2d 741, 759, 278 P.3d 653 (2012). The defendant also must show that the improper comments resulted in prejudice. *Emery*, 174 Wn.2d

12

at 760. Where the defendant does not object to the comments at trial, any claim of error is waived unless the misconduct was "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61.

As noted, McGary did not object to the purported misconduct below. Because both the cross-examination and argument at issue could have been cured with an appropriate instruction, we decline to consider it further. *See State v. Belgarde*, 110 Wn.2d 504, 508, 755 P.2d 174 (1988) (prosecutor's argument that defendant belonged to group of butchers and madmen that killed indiscriminately warranted reversal despite lack of objection); *State v. Claflin*, 38 Wn. App. 847, 850-51, 690 P.2d 1186 (1984) (prosecutor's reading of poem describing emotional impact of rape required reversal because no instruction could have cured the resulting prejudice), *review denied*, 103 Wn.2d 1014 (1985).

CUMULATIVE ERROR

Finally, McGary argues that cumulative error denied him the right to a fair trial. The cumulative error doctrine applies when several errors occurred during trial that would not merit reversal standing alone, but together effectively denied the defendant a fair trial. *State v. Hodges*, 118 Wn. App. 668, 673-74, 77 P.3d 375 (2003), *review denied*, 151 Wn.2d 1031 (2004). Having identified only one potentially harmless error, we reject McGary's claim of cumulative error.

PERSONAL RESTRAINT PETITION

McGary argues in his PRP that the State should be bound to the terms of the 2004 stipulation, thereby requiring his commitment to be evaluated on the basis of his personality disorder alone and precluding the State from arguing that other diagnoses support his commitment. He also asserts that because of his favorable annual review from Dr. Carter in

2010, he should be released because there is insufficient evidence to prove that he is currently suffering from a mental disorder.

In making these arguments, McGary largely ignores the 2011 trial and verdict. The jury's verdict that he still meets the criteria of an SVP disposes of his argument that Dr. Carter's 2010 annual review entitles him to release. Furthermore, the trial court denied a similar motion to dismiss or to preclude the State from offering evidence of additional diagnoses before the 2011 trial began. McGary did not challenge that ruling in his direct appeal and does not refer to it in his petition. His arguments have been rendered moot by the 2011 commitment trial. *See In re Det. of J.S.*, 138 Wn. App. 882, 889, 159 P.2d 435 (2007) (issue is moot when court can no longer provide meaningful relief).

McGary briefly refers to the 2011 trial in his reply brief, where he asserts that the State did not produce sufficient evidence of mental disorder to justify his continuing commitment. We disagree. The evidence summarized earlier is more than sufficient to satisfy the State's burden of proving beyond a reasonable doubt that McGary continues to meet the SVP criteria. *In re Det. of Keeney*, 141 Wn. App. 318, 324, 169 P.3d 852 (2007).

We affirm the order requiring McGary's continuing SVP commitment and deny his PRP.

QUINN-BRINTNALL, P.J.

We concur:

PENOYAR, J.

BJØRGEN, J.

14