FILED
COURT OF APPEALS
DIVISION II

2014 JUN -3 AM 8: 35

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

|  |  |
|---|---|
| In re the Detention of | No. 43404-1-II |
| TREMAYNE FRANCIS, | |
| Appellant. | UNPUBLISHED OPINION |

HUNT, P.J. — Tremayne Francis appeals the trial court's order of commitment to the Special Commitment Center in Steilacoom based on a jury's finding him to be a sexually violent predator (SVP), chapter 71.09 RCW. He argues that the trial court violated his due process right to present a complete defense when it excluded testimony about his awareness of the "two strikes" law, RCW 9.94A.570, because this testimony was relevant to disprove the State's assertion that he was likely to reoffend. The State counters that the trial court did not abuse its discretion in excluding the evidence because it was confusing and potentially prejudicial to the jury, and any error was harmless. We affirm.

FACTS

## I. SEXUAL OFFENSE HISTORY

### A. Initial Rape Convictions

Around June 17, 1998, Tremayne Francis invited SM[1], a 17-year-old male, to his home, allegedly for martial arts lessons. Francis made sexual advances against SM, threatened to kill SM if he did not comply, raped SM, and held SM captive for three hours before SM convinced Francis to release him. A few weeks later, another 17-year-old male, JB, agreed to attend martial arts training at Francis's home, where Francis raped him under threat of force. When Francis took JB home, he implied that JB would return to Francis "voluntarily or by force." Clerk's Papers (CP) at 3.

Police arrested Francis the next day for raping JB and SM. At first Francis told the arresting officers that "he didn't understand and [expressed] disbelief about two counts of rape"; later Francis stated, "I can see one but not two," referencing the two rape charges. CP at 18 (emphasis omitted). Francis later pled guilty to two counts of second degree rape by forcible compulsion for these offenses. In December 1998, Francis was sentenced to 119 months confinement on each count, to run concurrently, plus 36 months of community custody after his release from prison.

### B. Sexual Assaults in Prison

According to Dr. Brian W. Judd, during Francis's prison confinement, Francis faced "multiple non-adjudicated allegations of sexual misconduct or attempted coercion of sexual

---

[1] It is appropriate to provide some confidentiality in this case. Accordingly, it is hereby ordered that initials will be used in the body of the opinion to identify some parties involved.

acts." CP at 21. Francis was initially infracted on March 31, 2000, and placed in administrative segregation for allegedly threatening another inmate with harm if he did not submit to Francis's sexual demands. On July 8, Francis allegedly intimidated, threatened and coerced another inmate to perform sexual acts on Francis or suffer physical injury. The Department of Corrections (DOC) found Francis guilty of an infraction and sentenced him to 10 days of segregation and to loss of 30 days of good time credit. On October 12, yet another inmate reported that Francis had hit him, raped him, and threatened to kill him and his family.

On February 24, 2003, Francis was again placed in administrative segregation for "involuntary protective custody" "for extorting other inmates for sexual contact and possession of sexually explicit material." CP at 22 (emphasis omitted). A subsequent DOC investigation

> found information that inmate Francis was involved in pressuring other inmates for sex. The investigation is on-going. . . . Due to inmate Francis' demonstrated desire to continue identifying and pursuing potential sexual assault victims; he is not appropriate for any general population setting.

CP at 22 (emphasis omitted) (internal citations omitted).

On June 9, 2005, Francis told his cellmate, JG, that he had overheard a group of other inmates planning to assault JG, that he (Francis) would protect JG, but that he (Francis) would require "payment" for his protection services. CP at 3. JG initially refused. But after Francis threatened to assault JG, JG acquiesced, and Francis had sexual intercourse with JG over his protests. The next day, Francis again raped JG. When first confronted by "Prison Rape Elimination Act . . . Officers," Francis denied any sexual contact with JG, insisting that JG was lying. CP at 20. Francis later changed his story and said that he had had consensual sex with JG. As a result of these allegations, DOC placed Francis in administrative segregation on June 11,

3

2005, and charged him with infractions for sexually assaulting inmate JG. The State also charged Francis with two counts of second degree rape for sexually assaulting JG. A jury acquitted Francis of the charges, and DOC dismissed the institutional infractions for lack of evidence. DOC placed Francis in administrative segregation on three additional separate occasions between October 2006 and March 2007, for allegedly having coerced other inmates into performing sexual acts.

## II. PROCEDURE

### A. Psychological and Sexually Violent Predator Evaluations; SVP Petition

On August 31, 2007, Dr. Judd, evaluated Francis at the request of the Washington State Joint Forensic Unit. Dr. Judd is familiar with chapter 71.09 RCW and has experience in evaluating, diagnosing, and treating sex offenders, including making evaluations for possible SVP civil commitment. Dr. Judd reviewed police reports, court documents, health information, psychological evaluations, and DOC documents; he also interviewed Francis for four hours on August 31, 2007.

Dr. Judd opined that (1) "to a reasonable degree of psychological certainty," Francis meets the criteria for a sexually violent predator; (2) he suffers from "Paraphilia, Not Otherwise Specified (NOS) and Personality Disorder, Not Otherwise Specified (NOS) (with antisocial and narcissistic traits)"[2]; and (3) Francis's paraphilia is a mental abnormality, as defined in RCW 71.09.020, and, in conjunction with his personality disorder, causes him serious difficulty in controlling his sexually violent behavior and makes him "likely to engage in predatory acts of

---

[2] CP at 5.

sexual violence if not confined in a secure facility." CP at 6. Dr. Judd further noted, "Francis has either declined sexual deviancy treatment or been deemed not amenable to sexual deviancy treatment due to extreme minimization or denial of his crimes." CP at 27 (internal citations omitted).

In making this determination, Dr. Judd conducted a risk assessment, using two actuarial instruments: the Static-99 and the Sex Offender Appraisal Guide (SORAG). Francis scored a 5 or 6 on the Static-99, which corresponds to a "moderately-high" to "high" risk of reoffending. CP at 6. According to the Static-99, a "moderately-high" risk means that Francis had a 40 percent likelihood of reconviction for a new sexual offense over a 15-year period. CP at 6. Francis's score of 8 on the SORAG corresponds to a 39 percent probability of committing another sexual offense within 7 years and a rate of a 59 percent probability of reoffending within 10 years.

Dr. Judd also reviewed Francis's history for static and dynamic risk factors not included in the Static-99 or SORAG. Dr. Judd opined that, when considering factors such as Francis's age, general criminality, lifestyle instability, and psychopathy, his likelihood to reoffend increased. Dr. Judd further concluded that

> there are no factors mitigating [Francis's] risk for recidivism. [He] has not participated in offense specific treatment [and] has attempted to deflect responsibility for his offending through malingered mental illness and amnesia. . . . Moreover, incarceration, repeated referral to administrative segregation, and/or the threat of a life sentence without the possibility of parole has not served as a protective or mitigating factor. . . . Moreover, as incarceration and repetitive referral to administrative segregation has not mitigated [Francis's] sexually assaultive behaviors, there is no reason to believe that community supervision will appreciably mitigate [Francis's] risk of assaultive behavior.
> [. . . .]

> I believe Mr. Francis meets the criteria for a sexually violent predator as described in Chapter 71.09.020 of the Revised Code of Washington. I hold this opinion to a reasonable degree of psychological certainty.

CP at 6-7 (some alterations in original).

Based on Dr. Judd's report and Francis's medical history, the State petitioned the superior court to find that Francis is a sexually violent predator for purposes of chapter 71.09 RCW and to commit him under RCW 71.09.060. The case was tried to a jury.

### B. SVP Trial

#### 1. State's Witness, Dr. Judd

The State presented testimony from Dr. Judd, a licensed psychologist since 1991 and a "[f]ully certified . . . sex offender treatment provider" "since 2001 or 2002." 1 Verbatim Report of Proceedings (VRP) at 88. His "expertise has been examining and evaluating offenders, particularly sexual offenders, and looking at risk assessment and risk for recidivism, as well as providing treatment services to sexual offenders"[3] "since 1993, 1994." 1 VRP at 88. Dr. Judd explained to the jury that he had reviewed "victim and witness reports" relating to Francis's actions; "trial transcripts from [Francis's] 1998 trial"; and Francis's "DOC records, . . . police reports, court records, charging documents," and "mental health records from Western State Hospital." 2 VRP at 117, 118. Dr. Judd had also interviewed Francis in person, which interview included an evaluation of Francis's mental health, history, and development, and an opportunity for Francis to have an open discussion about his offenses.

---

[3] 1 VRP at 74.

Dr. Judd further explained that in evaluating Francis, he had used two actuarial instruments "generally accepted for use in the field of doing risk assessment of sex offenders,"[4] the "Static-99" (in use since 1993 or 1994) and the "SORAG" (in use since 1998). 2 VRP at 251. He diagnosed Francis with "Paraphilia, Not Otherwise Specified (Non-consent)" and testified that this condition

> affected [Francis's] ability to inhibit acting upon [his] urges. And the basis for saying that is the fact that even after being incarcerated for [SM] and for [JB], that we have a pattern of conduct over the years that indicated that he continued to act upon these urges which resulted in continued sanctioning at this point—at being placed in administrative segregation and other sanctioning while he was incarcerated.

2 VRP at 242. Dr. Judd added that his opinion about Francis's condition was also based on other "allegations that [had arisen in prison] with regard to Mr. Francis, . . . the fact that he was infracted in 2003[, and] allegations that he was trying to extort sexual favors again." 2 VRP at 243.

Dr. Judd agreed with the State's assertions that (1) Francis's "diagnosis make[s] him a menace to the health and safe[ty] of others," and (2) "predispose[s] Mr. Francis to the commission of similar acts." VRP at 243-44. Based on his evaluation and the actuarial instruments, Dr. Judd concluded that "to a reasonable degree of psychological certainty,"[5] Francis would likely reoffend if not committed to a secure facility.

---

[4] 2 VRP at 252.

[5] 2 VRP at 250-51.

## 2. Francis's witnesses

Francis's uncle, Michael Joseph Wilson, testified that he would be a source of support for Francis in the community. Francis also presented testimony from Dr. Betty Richardson, a former psychotherapist for DOC who currently is in private practice, and who had previously interacted with Francis. Dr. Richardson testified that, during her employment through the McNeil Island Corrections Center, (1) she had met with Francis "weekly for therapy and psychological evaluations[,] and [would] work with his counselors for recommendations [for mental health issues], if needed,"[6]; and (2) Francis had "difficulty in memory for disturbing situations, traumatic experiences . . . and [he was] very child-like around authority or any inmate that would show authority over him, and very unpredictable." 4 VRP at 447. Pat Capozzola, the operations manager in food service at the Special Commitment Center, testified that Francis's work habits were "[v]ery good" and his attitude was "okay." 4 VRP at 456.

Francis also presented testimony from Dr. Richard Wollert, a doctor in clinical psychology, who opined that Francis's actions were "criminal behavior[,]. not a product of a mental disorder." 5 VRP at 558. Dr. Wollert testified that (1) the diagnosis of "Paraphilia Not Otherwise Specified, Non-consent" (the diagnosis made by Dr. Judd) generally has a "terrible" reliability that "does not beat chance," 5 VRP at 544-45; (2) this diagnosis creates a "false positive rate [of] error, that it will over-identify people . . . as having a mental illness when the chances are, that behavior is not due to a mental illness at all; it's due to criminal decisions," 5 VRP at 546; (3) Francis's "behavior . . . does meet the threshold criterion because it's criminal behavior, but it's not recurrent, intense, sexually arousing fantasies or sexual urges that are of a

---

[6] 4 VRP at 445.

deviant, bizarre nature. [They're] criminal behavior. They're not a product of a mental disorder," 5 VRP at 557-58; (4) that Francis has not engaged in sexual assault while at the Special Commitment Center demonstrates that "he's responsive to the contingencies . . . or circumstances that would discourage [such conduct]," 5 VRP at 570; and (5) Dr. Wollert did not believe that Francis had alternate personalities. Dr. Wollert did not provide any diagnosis of Francis's conditions. Francis also testified in his own defense.

### 3. Sustained objection to "two strikes" law question

During Francis's testimony, his counsel asked:

[DEFENSE COUNSEL]: All right. Mr. Francis, are you aware of the Washington two strikes law for sex offenses?
[PROSECUTOR]: Objection, Your Honor.
[COURT]: I'm going to sustain that objection.

4 VRP at 501-02. Francis's counsel neither responded nor attempted to rephrase the question to elicit more precisely Francis's understanding of the consequences if he were to commit additional sexual offenses. Instead, Francis's counsel switched to another line of questioning. After cross-examination and re-direct examination, Francis concluded his testimony, and the trial court excused the jury.

Before adjourning for the day, the trial court asked counsel if there were "Any other housekeeping matters?" 4 VRP at 510. Francis's counsel engaged in the following colloquy with the trial court:

[DEFENSE COUNSEL]: . . . You sustained the State's objection when I asked him about Washington two strikes law, and I don't have a clue why, and I need to learn why.
[COURT]: Okay. My concern was that the jury might be confused and would start to speculate about why—if [Francis] had pled guilty to two sex offenses, why he wouldn't be potentially subject to life in prison without parole,

9

and I didn't want them speculating, and maybe improperly so, that the reason that [Francis] went to trial on [the matter of inmate JG] was because it would have been he'd be a persistent offender, and so I didn't want to open up those particular cans of worms. Plus I don't know—there was no foundation laid suggesting that Mr. Francis has any kind of expertise or personal knowledge about Washington statutes and whether or not he'd be a persistent offender or could face life in prison—

[DEFENSE COUNSEL]: I think—

[COURT]: —for a second offense.

[DEFENSE COUNSEL]: —that was my question is if he was aware of those laws. And I had planned to ask him then if he believes he has one strike from the 1998 cases and that another sex offense would result—a conviction would result in his being life without possibility of parole. That's where I had intended to go.

4 VRP at 512-13. Counsel did not ask for permission to rephrase the question or to recall Francis to the stand to testify more generally about his knowledge of the consequences for committing additional offenses, aside from knowledge about the persistent offender law in particular.

### 4. Jury's SVP finding

The jury returned a verdict finding that the State had proved beyond a reasonable doubt that Francis was a sexually violent predator. That same day, the trial court ordered Francis

committed to the Special Commitment Center in Steilacoom, Washington, to the custody of the Department of Social and Health Services, for control, care, and treatment until such time as his mental abnormality and/or personality disorder has so changed that [he] is safe to be conditionally released to a less restrictive alternative or unconditionally discharged.

CP at 102. Francis appeals.

ANALYSIS

Francis argues that when the trial court excluded testimony about his knowledge of Washington's "two strikes"[7] law[8], it violated his due process right to "'a meaningful opportunity to present a complete defense.'" Br. of Appellant at 8 (quoting *State v. Wittenbarger*, 124 Wn.2d 467, 474, 880 P.2d 517 (1994) and citing *In re Welfare of Hansen*, 24 Wn. App. 27, 36, 599 P.2d 1304 (1979)); RCW 9.94A.570. He contends that this testimony was relevant to show that he was less likely to reoffend because he knew he faced mandatory life in prison for any future sexual offense conviction. We note, however, that (1) the trial court excluded testimony only about Francis's knowledge of the "two strikes" law in particular; (2) defense counsel did not ask Francis whether he knew in general that he faced mandatory life in prison for any future sexual offense or any other question pertaining to Francis's state of mind about punishment for future crimes and its possible deterrent effect; and (3) the trial court, therefore, never had an opportunity to rule on the admissibility of this latter kind of knowledge. *See* 4 VRP at 501-02. We hold that the trial court acted within its discretion when it excluded Francis's testimony about his knowledge of the "two strikes" law.

I. STANDARD OF REVIEW

To be admissible evidence must be relevant. ER 402. "To be relevant, evidence need only have 'any tendency to make the existence of any fact that is of consequence to the

---

[7] Br. of Appellant at 7.

[8] RCW 9.94A.570, the "two strikes" law discussed in *In re Pers. Restraint of Carrier*, 173 Wn.2d 791, 797-98, 272 P.3d 209 (2012), provides a mandatory sentence of life in prison without the possibility of parole for offenders who are convicted a second time of a crime listed in RCW 9.94A.030(37)(b).

determination of the action more probable or less probable than it would be without the evidence.'" *In re Det. of Post*, 170 Wn.2d 202, 311, 241 P.3d 1234 (2010) (quoting ER 401). We review a trial court's ruling on the admissibility of evidence for abuse of discretion. *Post*, 170 Wn.2d at 309 (citing *City of Auburn v. Hedlund*, 165 Wn.2d 645, 654, 201 P.3d 315 (2009)). "A trial court abuses its discretion if it relies on unsupported facts, applies the wrong legal standard, or adopts a position no reasonable person would take." *In re Det. of McGary*, 175 Wn. App. 328, 337, 306 P.3d 1005 (citing *State v. Lord*, 161 Wn.2d 276, 284, 165 P.3d 1251 (2007)), *review denied*, 178 Wn.2d 1020 (2013). Thus, we will not overturn such a discretionary ruling "absent manifest abuse of discretion." *State v. Wilson*, 60 Wn. App. 887, 890, 808 P.2d 754 (1991) (citing *State v. Hughes*, 106 Wn.2d 176, 201, 721 P.2d 902 (1986)).

At an SVP determination trial, the fact finder must resolve one question: "Has the State proved, beyond a reasonable doubt, that the respondent is an SVP?" *Post*, 170 Wn.2d at 309 (citing RCW 71.09.060(1)).

> To answer this question[,] the jury must determine three elements: (1) that the respondent 'has been convicted of or charged with a crime of sexual violence,' (2) that the respondent 'suffers from a mental abnormality or personality disorder,' and (3) that such abnormality or disorder 'makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility.'

*Post*, 170 Wn.2d at 309-10 (quoting RCW 71.09.020(18) and citing *In re Det. of Audett*, 158 Wn.2d 712, 727, 147 P.3d 982 (2006)). The sole SVP element at issue here is the third one, which requires the jury to find both that the "abnormality or disorder causes the likelihood of future acts" and that there is a greater than 50 percent probability that the defendant will

reoffend. *Post*, 170 Wn.2d at 310.[9] In order to challenge the trial court's exercise of its discretion, Francis must show that the excluded evidence was relevant to this third SVP element. *Post*, 170 Wn.2d at 311. In this endeavor, he fails.

## II. RELEVANCE AND ADMISSIBILITY OF EXCLUDED "TWO STRIKES" TESTIMONY

Our Supreme Court has observed that a defendant's "knowledge of the consequences for engaging in [prohibited] conduct may well serve as a deterrent to such conduct and, therefore, has *some tendency* to diminish the likelihood of his committing another predatory act of sexual violence. This likelihood, of course, is an element that the jury must address." *Post*, 170 Wn.2d at 316-17 (emphasis added) (citing RCW 71.09.020(18)).[10] But Francis's understanding of the legality of the "two strikes" law, RCW 9.94A.570, is not the same as knowledge of the consequences for engaging in prohibited conduct relevant to his risk of reoffense,[11] about which defense counsel did not ask.[12] *See Post*, 170 Wn.2d at 316; RCW 71.09.020(18).

---

[9] (Citing *In re Det. of Thorell*, 149 Wn.2d 724, 736, 742, 72 P.3d 708 (2003) and quoting *In re Det. of Brooks*, 145 Wn.2d 275, 298, 36 P.3d 1034 (2001), *overruled on other grounds by Thorell*).

[10] Francis's argument relies on an overly expansive reading of *Post*. In *Post* our Supreme Court expressly declined to rule that evidence of the SVP respondent's knowledge about the "two strikes" law was admissible, only that it was relevant. *Post*, 170 Wn.2d at 317.

[11] Even if Francis's testimony about his knowledge of Washington's "two strikes" law were relevant to his risk of reoffense, the trial court still had discretion to preclude it under ER 403 for prejudice or confusion. *See Post*, 170 Wn.2d at 317.

[12] We note, however, that by the time defense counsel asked Francis about his awareness of the "two strikes" law, Francis had already raised the issue of a potential sentence of life without parole when he testified about (1) his alleged 2005 sexual assault against inmate JG; (2) his experience being interrogated about the incident by law enforcement; and (3) his "understanding in [his] mind at the time . . . that [he] was in very big trouble and the possibility that [he] would remain in prison for the rest of [his] life." 4 VRP at 488.

13

Francis does not show that (1) his proffered testimony about the "two strikes" law was relevant to his knowledge of future punishment and its impact on his likelihood to reoffend, and (2) that the trial court's rejection of it was either "untenable," *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995), or a position that "no reasonable person would take." *McGary*, 175 Wn. App. at 337. Accordingly, we hold that the trial court did not abuse its discretion in excluding this narrow testimony, and we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Hunt, P.J.

We concur:

Worswick, J.

Melnick, J.