# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

RAUL SWAIN and KATHLEEN )
SCHONS, individually and as guardians ) No. 71616-6-I
of minor child JAXOM SWAIN-SCHONS,)
) DIVISION ONE
Respondents, )
) UNPUBLISHED OPINION
v. )
)
SWEDISH HEALTH SERVICES d/b/a )
SWEDISH MEDICAL CENTER, and )
MICHAEL C. SHANNON, M.D., )
)
Appellants. ) FILED: June 15, 2015

TRICKEY, J. — Generally all relevant evidence is admissible, except as limited by constitution, statute, or other evidentiary rule. ER 401. The decision to exclude or allow testimony in rebuttal in a medical malpractice case depends in part on whether the proponent intentionally violated discovery rules and whether there was any prejudice in permitting such testimony. Here, the plaintiffs disclosed a treating physician as a witness and submitted her report months before trial to the defendants. Because the defendants were already aware of the physician's conclusions from her report, there was no prejudice. Her testimony merely corroborated her report, which was also admitted into evidence.

Nor did the trial court abuse its discretion in the remaining evidentiary rulings the defendants raise in this appeal. Affirmed.

## FACTS

This is a medical malpractice case arising out of medical care Dr. Michael Shannon and Swedish Medical Center (collectively, Shannon) provided to Jaxom Swain-Schons.

On August 14, 2011, Jaxom, then 20 months old, experienced a febrile seizure. Paramedics arrived and Jaxom appeared to be stabilized. After the paramedics left, Jaxom had a second seizure. The parents took him to Swedish Mill Creek Emergency Department. While there, Jaxom had another febrile seizure. The nurses at Mill Creek were unable to install an intravenous (IV). The clinic decided to transfer Jaxom to Swedish First Hill (Swedish) Pediatric Intensive Care Unit in Seattle.

Swedish sent its pediatric transport team, consisting of a nurse, Dr. Shannon, and a respiratory therapist to Mill Creek. On arrival there, the transport nurse placed a peripheral IV in one of Jaxom's hands and readied him for transport. During the ambulance ride to Swedish, the peripheral IV failed.

At the hospital, after several unsuccessful attempts to place another peripheral IV in Jaxom, a decision was made to install a central line by placing a femoral central venous catheter. Dr. Shannon performed the installation.

Jaxom was discharged the following day. On August 18, his parents returned to Swedish because Jaxom was complaining of neck pain and a headache, and was walking funny at times with a wide gate. Physicians at Swedish informed Jaxom's parents that the symptoms were probably a result of the anti-seizure medication and should dissipate within a few days.

Jaxom continued to experience these symptoms and began behaving abnormally. His body would sometimes stiffen and he experienced episodes of pain causing him to cry uncontrollably. In December, a neurologist saw Jaxom, but did not find any cause for Jaxom's symptoms.

On February 29, 2012, the parents noticed a small bump on Jaxom's neck, near his collarbone. Jaxom's pediatrician prescribed antibiotics. Later that day, the cyst had moved and the parents took Jaxom to the Everett emergency clinic. X rays revealed two long metal wires in his body.

Jaxom was transferred by ambulance to Seattle Children's Hospital. Dr. George Drugas, a pediatric surgeon at Children's Hospital, removed a guidewire from Jaxom's body on March 1, 2012.

Jaxom and his parents filed suit. The jury returned a verdict of $500,000 for Jaxom and $250,000 each for his parents. Shannon timely appeals.

## ANALYSIS

Shannon contends the trial court made multiple evidentiary errors. Specifically, Shannon contends that the trial court erred by permitting one of Jaxom's treating physicians to testify in rebuttal, excluding his expert metallurgist from testifying regarding reports of product failure, admitting evidence regarding the length of his shift rotation, and a checklist used by another hospital for similar procedures.

Evidentiary decisions are within the sound discretion of the trial court. A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. Silas v. Hi Tec Erectors, 168 Wn.2d 664, 668-69, 230 P.3d 583 (2010).

Rebuttal Testimony

During the plaintiffs' case-in-chief, the plaintiffs informed the court that Dr. Teresa Chapman, a radiologist at Children's Hospital, might be called as a rebuttal

witness depending on the testimony of Dr. Timothy Larson, the defense's expert radiologist. The defense argued that Dr. Chapman was merely a treating physician and should not be called on rebuttal. The following colloquy occurred:

> THE COURT: It seems, if what Dr. Chapman is going to say, is she looked at these x-rays and they were not coiled, they were straight wires, that would then rebut presumably your Dr. Larson who is going to say he looked at the fluoroscopy of the x-ray or something and saw coiled architecture.
>
> [DEFENSE COUNSEL]: Right
>
> THE COURT: Right now we don't have anybody that has actually testified that anybody saw coiled architecture.
>
> [DEFENSE COUNSEL]: Well, nobody has testified, that's right. We only have the records.
> That is why I think you are perfectly entitled to call her in their case in chief. They should. She is obviously available. He told you she was. She should come in and testify. And we will listen to what she says and why, and then when we have Dr. Larson aboard, he will testify as he did in his deposition.
> So if you look at the test of rebuttal, that wouldn't be rebuttal under these circumstances.
>
> THE COURT: It would be rebuttal if nobody has testified yet it is coiled, right? So then she is going – your witness is going to say, we looked at the x-ray, it is coiled. She is going to come in afterwards and say, no, I looked at the x-ray and it was not coiled. That is rebuttal.
>
> [DEFENSE COUNSEL]: Well, but that is true, technically that would be rebuttal. But the rule on rebuttal, as I understand it, it is something that can't be reasonably anticipated.
> We have known from the get-go what the two theories of the case are. They know and they had Dr. Drugas talk today about it being a straight wire. That is what he said. And he said he looked at the fluoroscopy. So they have had that on there.
> Now we have Dr. Larson coming in, he says, no, I have looked at it and it is coiled.
> I just think if they really want to get Dr. Chapman's testimony, and she is a factual witness, she only read, she only read the plane films.[1]

---

[1] Report of Proceedings (RP) (12/11/13) at 179-181.

Dr. Chapman, a radiologist at Seattle Children's Hospital, testified regarding her reading of the X rays. She testified that the X rays taken from the Everett clinic indicated that there was a wire protruding upward, "tenting the skin."[2] She further stated:

> And then this is the smooth linear course of this radio density, this wire, which courses up into the head. It is just a nice example when you magnifies these up the margins of the wire are very smooth, which, again, this is why I am calling them wires. This is what wires look like. They are radio dense with very smooth margins.[3]

The plaintiffs then inquired what Dr. Chapman thought regarding the defense's theory that the objects were not wires, but the coiled portion separated from the guidewire. Defense counsel objected.

After an unreported sidebar discussion, plaintiffs' counsel asked the following question:

> Dr. Chapman, since learning about the defense theory of this coiled portion coming off, have you examined a guidewire to see the coiled portion separated from the central wire?[4]

Dr. Chapman answered affirmatively. The plaintiffs then asked if what Dr. Chapman had seen on the X rays taken was just a coil and not a guidewire. She responded:

> It is not possible. I have actually seen what a coil looks like under a radiograph. It has a different texture to it. It literally looks like a Slinky kind of coil. It is radio dense but not quite as dense as this and it does not have smooth margins. Nor would it act firmly. These have some strength to them. A coil is flimsy and would be wavy, might even collapse. Certainly couldn't lift skin up like what we are seeing on the radiograph. These are wires.[5]

---

[2] RP (12/18/13) at 68.
[3] RP (12/18/13) at 73.
[4] RP (12/18/13) at 74.
[5] RP (12/18/13) at 74.

Dr. Chapman's answer is consistent with her report dated February 29, 2012, wherein she stated: "There are 2 thin metallic densities in the chest, consistent with wires, as seen on the comparison study."[6]

Her testimony is likewise in accord with the written report by Dr. John Ho, who along with Dr. Drugas removed one of the two wires from Jaxom:

> There is a retained guidewire coursing the sigmoid sinus on the right side down the internal jugular vein through the superior vena cava and ending in the right atrium. The wire has been retrieved with a trilobedm ensnare. Follow up venogram shows no evidence of extravasation. The wire was removed entirely.[7]

This court reviews decisions regarding rebuttal testimony for abuse of discretion. State v. White, 74 Wn.2d 386, 394-95, 444 P.2d 661 (1968). Such abuse occurs only when no reasonable person would take the adopted view. Vasquez v. Martin, 46 Wn. App 480, 483, 731 P.2d 510 (1986). Rebuttal testimony may be somewhat cumulative.

> Ascertaining whether the rebuttal evidence is in reply to new matters established by the defense, however, is a difficult matter at times. Frequently true rebuttal evidence will, in some degree, overlap or coalesce with the evidence in chief. Therefore, the question of admissibility of evidence on rebuttal rests largely on the trial court's discretion, and error in denying or allowing it can be predicated only upon a manifest abuse of that discretion.

White, 74 Wn.2d at 395.

Here, Dr. Chapman's testimony directly rebutted Dr. Larson's testimony. Dr. Chapman testified that based on her review of the images and her expertise, the wires were straight, not uncoiled, and that uncoiled wires would not have

---

[6] Exhibit (Ex.) 6-00009.
[7] Ex. 6-00014.

behaved in the manner that these wires did inside Jaxom's body. She described the object as "radio dense with very smooth margins" and that only a wire would be firm enough to tent the skin as was done here.[8]

There was no prejudice or surprise to the defendants. Dr. Chapman was disclosed as a possible primary witness in April 2013. Her name was on the medical records from Children's Hospital, which the defendants had received even earlier.

Shannon cites Kremer v. Audette, 35 Wn. App. 643, 648, 668 P.2d 1315 (1983), for the proposition that a plaintiff is not permitted "to present . . . evidence cumulatively at the end of [a] defendant's case."[9] But in the trial court's view, Dr. Chapman's rebuttal testimony was proper because no one had yet testified to the object inside of Jaxom as being a coil rather than a wire. Defense counsel agreed that no one had testified but argued that the record so indicated. There was no abuse of discretion.

Defense counsel argued that Dr. Chapman derived her opinion not from her treatment but from experiments run afterwards. But Dr. Chapman's opinion that the objects in Jaxom's body were wires is clearly stated in her report while she was a treating physician. Even if the evidence is cumulative to what was in the admitted reports, the admission of cumulative evidence is a matter within the court's discretion. Christensen v. Munsen, 123 Wn.2d 234, 241, 867 P.3d 626 (1994).

A treating physician may testify as to both fact and medical opinion. Carson v. Fine, 123 Wn.2d 206, 215-16, 867 P.2d 610 (1994). Here, unlike the cases cited

---

[8] RP (12/18/13) at 73.
[9] Appellant's Reply Br. at 5.

7

by Shannon, there was no undue surprise or prejudice. Dr. Chapman's testimony regarding any secondary action she might have taken after reviewing defense testimony (that what remained in Jaxom was a coil and not a guidewire) was consistent with the evidence that defense knew existed, i.e., wires were left in Jaxom.

ER 703

Defense retained metallurgist Keith Cline as an expert witness. In voir dire outside the presence of the jury, defense counsel asked Cline about MAUDE (Manufacturer and User Facility Device Experience) reports concerning Cook guidewires. Cline testified that as a metallurgical engineer, he had reviewed MAUDE reports, provided by defense counsel, to obtain background on the history of the wire device. None of the cases in the MAUDE reports were exactly like the present case.

In cross-examination on voir dire, Cline testified that he did not rely on the MAUDE reports for the specific failure of the guidewire in this case. In response to questioning from the court, Cline noted that there were no instances where the inner coil separated from the outer coil in the MAUDE reports.

Plaintiffs moved to restrict the MAUDE reports based on federal law and ER 703. The court asked the lawyers to limit their arguments to whether or not the reports should be excluded under ER 703. ER 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

The trial court granted the motion to exclude the MAUDE reports based on ER 703 for the following reasons:

> My impression of him on the stand was he didn't even know about a MAUDE report until he was presented it from defense counsel. It is possible that he said, well, you do research and you try to find out anything you can about product failures. He said I think probably other metallurgists probably do that too.

> I think the rule is clear that it's not enough that the particular expert relied on this [sic] facts or data that were given to him by defense counsel, but the proponent of the testimony must show the experts in the witness's field in general reasonably relied on such material in their own work for purposes other than litigation. That is the thing I don't think has been established, that other metallurgists rely on MAUDE reports for purposes other than litigation. I feel that that has not been, that standard has not been met.

> And it bothers me as well that there is really no other reporting here. I don't know how he can rely on them when there is no reporting here that has a failure similar where we are talking about the inner core separating from the outer core.

> He does have reports that say something was cut with a needle or scalpel or it was cut and the ends were frayed. But I don't know how that informs his decision on whether or not -- I don't know why I am forgetting that word, the places where they are soldered together -- welds -- that the welds had failed.[10]

This court reviews the trial court's exclusion of this testimony to determine whether the exclusion was manifestly unreasonable or based on untenable grounds or reasons. State v. Roberts, 142 Wn.2d 471, 520, 14 P.3d 713 (2000).

Because ER 703 is concerned with the trustworthiness of the resulting opinion, it is not sufficient to show that the particular expert in question customarily relies on the facts and data in question. A proponent of the testimony must show that experts in the witness's field, in general, reasonably rely on such material in

---

[10] RP (12/16/13) at 70.

their own work, for reasons other than litigation. In re Detention of Marshall, 156 Wn.2d 150, 161, 125 P.3d 111 (2005).

The trial court's decision found that the reports were not reasonably relied upon by experts and thus insufficient to support the expert's opinion. In re Detention of McGary, 175 Wn. App. 328, 341, 306 P.3d 1005, review denied, 178 Wn.2d 1020, 312 P.3d 651 (2013). The trial court did not abuse its discretion.

Checklist and Length of On-Call Shift

Shannon also argues that the trial court erred in denying his motion to exclude the testimony regarding both the length of his on-call shift and that Children's Hospital used a checklist when performing this type of procedure. Shannon contend that this testimony was irrelevant and prejudicial.

In ruling against this motion, the trial court stated:

> The fact that Dr. Shannon didn't use a checklist -- Dr. [Kenneth] Schenkman is an expert and isn't that the reason he is being called is to say this is what Dr. Shannon didn't do, and in fact, my expert opinion, if he had done X, Y and Z he could have avoided this mistake. That is tantamount to a checklist. That is his opinion about how to avoid leaving objects in a patient, presumably.[11]

The trial court noted that defense could elicit from Dr. Schenkman that a checklist is not required and, therefore, not using a checklist does not violate the standard of care. The court further noted, "That doesn't mean he can't opine that would have been one way to mitigate the problem, is what I am saying. That is why I am denying the motion."[12] For similar reasons, the court permitted defense to admit evidence that Dr. Shannon had worked a 48-hour shift and was in his 41st hour.

---

[11] RP (12/9/13) at 91-92.
[12] RP (12/9/13) at 92.

Generally all relevant evidence is admissible, except as limited by constitution, statute, or other evidentiary rule. ER 402. Evidence is relevant if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Thus, in a medical malpractice suit, physicians may testify as to their professional conduct that is repeatedly and consistently performed when treating persons with similar symptoms so long as it is relevant.

The plaintiffs' expert, Dr. Kenneth Schenkman, a pediatric critical care doctor at Children's Hospital, reviewed the care provided by Dr. Shannon. Dr. Schenkman stated that Children's Hospital used a checklist in response to a question from counsel about how physicians at Children's Hospital ensure that a guidewire is removed after a procedure.

Here, the testimony was proffered to counteract the defense's theory that an experienced doctor, such as Dr. Shannon, would not have left a guidewire in a patient. While this statement might be true in ordinary circumstances, the length of Dr. Shannon's shift (41st hour of a 48-hour on-call shift) and not using a checklist could explain why no one discovered the guidewire in Jaxom until months later.

On cross-examination, defense counsel inquired about the checklist. Dr. Schenkman specifically stated that he was not telling the jury that the standard of care required Dr. Shannon to use a checklist. Dr. Schenkman also stated there were no rules about the amount of time physicians can work. On redirect, plaintiffs' counsel elicited that Children's Hospital does not have 48-hour shifts. Dr. Schenkman testified that the checklist was just a tool to help avoid errors.

The trial court did not abuse its discretion in admitting this relevant testimony.

Because we find that the trial court did not abuse its discretion in the evidentiary rulings challenged on appeal, we need not address the plaintiffs' argument that the physician was liable as a matter of law. We affirm the judgment.

Trickey, J

WE CONCUR:

Leach, J.

Dwyer, J.