FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 JUN 25 AM 8: 46



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of<br><br>J.J.,<br>DOB: 11/27/07,<br><br>             Minor Child.<br><br>STATE OF WASHINGTON,<br>DEPARTMENT OF SOCIAL AND<br>HEALTH SERVICES,<br><br>             Respondent,<br><br>             v.<br><br>PATRICIA DIMITRY,<br><br>             Appellant. | No. 76971-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br><br><br><br><br><br><br><br><br>FILED: June 25, 2018 |

TRICKEY, J. — Following an 11-day trial, the juvenile court terminated the legal rights of Patricia Dimitry, legal custodian of 9-year-old J.J., under the statutory provisions set forth in chapter 13.34 RCW. Substantial evidence supports the court's finding that the Department of Social and Health Services offered all necessary and available services capable of correcting Dimitry's parental deficiencies. The court did not abuse its discretion by limiting portions of expert testimony offered by Dimitry. We affirm.

## FACTS

This case concerns J.J., a child born to Laura Jenkins on November 27, 2007 in Louisiana. Patricia Dimitry[1] became J.J.'s legal custodian in June 2009, after Jenkins approved a "Consent Judgment on Custody Child Support" in Louisiana purporting to transfer legal custody to Dimitry.[2]

Before J.J. was born, Dimitry was involved in serious crimes and was convicted of two counts of accessory after the fact to first degree murder. She served approximately five years in a Louisiana correctional facility, where she reconnected with Jenkins, and was released in 2007.

After J.J.'s birth, Dimitry, Jenkins, and J.J. lived together. In 2010, they moved to Texas. There, Jenkins gave birth to another child, A.D. After a fire destroyed their home in Texas, they moved for a brief period to Utah and then to Hawaii. In both Texas and Hawaii, Child Protective Services (CPS) received reports regarding the welfare of the children. Eventually, they relocated to Seattle where Dimitry believed she would find employment selling artwork at Pike Place Market.

In March 2014, when J.J. was 6 years old, a staff member of a Seattle homeless shelter reported to CPS that J.J. and A.D. appeared to be malnourished and dirty, and expressed concerns about the safety of their living arrangements. The Department of Social and Health Services (the Department)

---

[1] Some documents in the record refer to Dimitry by her former names, Patricia Guillory and Patricia Biehn.

[2] Ex. 22. The rights of J.J.'s biological parents are not at issue in this appeal, nor does this appeal pertain to J.J.'s half-sister, A.D.

2

took the children into protective custody. The children were placed in licensed care and have not been returned to Dimitry's or Jenkin's care since that time.

When J.J. came into state custody, he had few verbal or social skills, did not understand the concept of meals or bedtime, could walk but not run, and did not appear to be toilet-trained. He had significant dental problems that took months to resolve. After he was placed in licensed care, J.J. was diagnosed with posttraumatic stress disorder (PTSD).

In May 2014, the court entered agreed dependency orders for J.J. as to both Dimitry and Jenkins. The agreed-upon factual basis for the dependency included Dimitry's criminal history, her acknowledged physical and mental health conditions, J.J.'s sporadic school attendance, and housing instability. The dispositional order required Dimitry to obtain a psychiatric evaluation with a parenting component to be completed by a specific provider, Dr. Joanne Solchany, a psychiatric nurse practitioner, and to follow any treatment recommendations resulting from that evaluation. The order also required Dimitry to engage in 90 days of urinalysis testing and to maintain stable housing suitable for children.

Dimitry obtained the court-ordered psychiatric evaluation and successfully completed the required urinalysis testing, but otherwise did not consistently engage nor successfully complete the services recommended following the evaluation.

In December 2014, based on her psychiatric evaluation of Dimitry, Dr. Solchany concluded that Dimitry met the criteria for a diagnosis of "not otherwise

specified personality disorder" and also the criteria for borderline, antisocial, narcissistic, and histrionic personality disorders. Dr. Solchany found that these diagnoses affected Dimitry's ability to parent. For example, Dimitry demonstrated difficulty focusing on J.J. rather than herself, was impulsive and unstable, and showed a propensity toward anger. Dr. Solchany concluded that Dimitry's prognosis was "poor" and that she was not able to safely parent J.J.[3] Dr. Solchany described these conditions as "pervasive," "inflexible," and "often very difficult to treat."[4]

Dr. Solchany recommended that Dimitry participate in dialectical behavioral therapy (DBT) in a group-based program coupled with individual counseling to help her develop insight and accountability for her actions and choices. Dr. Solchany recommended that Dimitry participate in mental health treatment for at least a year, and preferably for two years. She also recommended that Dimitry continue to participate in parent coaching in order to develop empathy and insight.

Department social worker Denise Huynh was assigned to J.J.'s case throughout the dependency period. During this time, Huynh made approximately 20 referrals for Dimitry. These included referrals to Sound Mental Health for mental health therapy, referrals for parent coaching and parent training, for in-home services, and referrals for visitation supervisors. The social worker also provided bus tickets to Dimitry. Dimitry never inquired of the social worker about

---

[3] 2 Report of Proceedings (RP) at 270-71.
[4] 6 RP at 881.

4

J.J.'s progress in school or his health, nor asked to attend any of his appointments.

In the summer of 2014, Dimitry participated in two sessions of mental health treatment with a therapist at Sound Mental Health, but did not continue. Two years later, Dimitry participated in DBT for about six months with a different provider, John Buscher. Although Dr. Solchany recommended a group therapy component, Dimitry did not want to participate in group therapy because it made her feel anxious, so Buscher agreed to provide DBT on an individual basis. However, Dimitry's engagement was intermittent; she saw Buscher approximately 10 times during the six month period, did not complete the assigned homework, and eventually stopped participating altogether because she had "a lot going on."[5] Buscher explained that DBT consists of four modules and Dimitry failed to complete any of the modules. According to Buscher, Dimitry would need to consistently participate in DBT for at least nine months to finish the modules and only then could he assess her progress.

Dimitry worked with two parent coaches during the dependency. Esther Patrick provided parent coaching to Dimitry for approximately a year until October 2015, when Dimitry refused to work with her any longer. Although Patrick made herself available to meet regularly and was willing to provide the service at Dimitry's home, Dimitry met with her only approximately 12 times over the course of 13 months. According to Patrick, Dimitry's home was not safe or

_____

[5] 5 RP at 588.

suitable for children. It was unhygienic, infested with bedbugs and cockroaches, and did not improve despite the household assistance she provided.

Dimitry largely failed to engage during the sessions and was more focused on her boyfriend. Patrick attempted to conduct visitation observations, but Dimitry did not attend the scheduled visits. Dimitry insisted that she did not need the service because she is an experienced parent. Although Dimitry denied it, Patrick also suspected that Dimitry was involved in a domestic violence relationship based on her observation of suspicious and extensive bruising. On one occasion, she also observed cuts on Dimitry's wrists. Dimitry admitted that she had harmed herself, and blamed the social worker. Patrick recommended that Dimitry participate in domestic violence services and mental health treatment.

Mental health therapist Carmela Martin provided further parent coaching to Dimitry. Martin worked with Dimitry individually, and also listened in on a telephone visit with J.J., and observed two in-person visits with J.J. Dimitry required intervention to maintain appropriate boundaries, engage in age-appropriate communication, and provide a safe environment for J.J. Although Dimitry maintained that she did not require assistance, she did not demonstrate an ability to prioritize and meet J.J.'s needs. Dimitry's inability to accept constructive criticism impeded her ability to make progress. Eventually, based on her determination that the telephone visits were harmful to J.J., Martin recommended suspension of contact between Dimitry and J.J.

When the dependency was first established, the court allowed Dimitry to have three supervised visits per week with J.J. Dimitry visited J.J. somewhat regularly for the first few months, but then began to miss her visits. Over the span of 14 months, between August 2014 and October 2015, Dimitry visited J.J. 10 times, although she was permitted to have more than 100 visits during that time. Dimitry said she was unable to attend many visits due to transportation issues.

In October 2015, after J.J. was admitted to the Ryther Center for Children and Youth due to escalating behavior problems in his foster home, Dimitry's visitation changed to weekly 15-minute supervised telephone contact. In December 2015, the Department moved to terminate Dimitry's custodial rights.

In March 2016, J.J. transitioned to a second foster care placement. About six months later, around the time of J.J.'s two observational in-person visits with Dimitry, he displayed new and concerning behaviors. J.J. consistently expressed to the social worker, the Court Appointed Special Advocate (CASA), and others that he did not feel safe with Dimitry and did not want in-person or other regular communication with her. Three months before trial, the court suspended all visitation with Dimitry on the ground that the visitation was psychologically and emotionally harmful to J.J. and had caused him to regress, decompensate, and suffer additional trauma.

Shortly before the trial, the court conducted a conference with a Louisiana court pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act.[6] Louisiana relinquished jurisdiction in favor of Washington.

The trial on the Department's petition took place in May 2017, when J.J. was 9 1/2 years old and had been out of Dimitry's care for more than three years. Although J.J. still had special needs due to his PTSD diagnosis, speech delays, and behavioral challenges, he had significantly improved with regard to speech, mobility, and emotional regulation. His behavior significantly improved after contact with Dimitry was suspended. He continued to visit weekly with his half-sister, A.D. Dimitry did not attend the trial.[7]

After considering the testimony of 10 witnesses and 39 exhibits, the court entered over 85 findings of fact and conclusions of law and an order terminating the legal relationship between Dimitry and J.J.

## ANALYSIS

The juvenile court concluded that Dimitry was J.J.'s legal custodian and a proper party to these proceedings and that termination of her legal rights was governed by the rigorous standards set forth in chapter 13.34 RCW. The Department has not filed a cross appeal challenging those rulings. We therefore

---

[6] See Washington State's Uniform Child Custody Jurisdiction and Enforcement Act, chapter 26.27 RCW.

[7] According to a document Dimitry submitted after the trial, she explained that she now lives in California and was unable to travel to Washington for the trial. She further stated that she did not want to attend trial because she believed that the Department's attorney would only want to discuss her prior criminal history.

assume for purposes of this appeal that the statutes applicable to the termination of parental rights apply here.[8]

Under the termination statutes, the juvenile court may order termination of parental rights if (1) the State proves the six statutory elements of RCW 13.34.180 by clear, cogent, and convincing evidence; and (2) the court finds that termination is in the child's best interests. RCW 13.34.190; In re Dependency of K.S.C., 137 Wn.2d 918, 925, 976 P.2d 113 (1999). In this appeal, only one of the six statutory elements under RCW 13.34.180(1) is at issue:

> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.

RCW 13.34.180(1)(d).[9] Clear, cogent, and convincing evidence is evidence that shows the ultimate fact at issue to be highly probable. K.S.C., 137 Wn.2d at 925. We give deference to the trial court in weighing the evidence and witness credibility. In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980).

---

[8] Contrary to Dimitry's argument it is neither "undisputed" nor established that she is J.J.'s de facto parent. Opening Br. of Appellant at 8. However, in light of the court's application of the termination statutes, Dimitry's argument that she is entitled to the same rights as biological parents is moot.

[9] The other statutory elements are as follows:

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> . . . .
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . ; and
> (f) That the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1).

"The court's factual findings must be upheld if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence." K.S.C., 137 Wn.2d at 925. Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the fact at issue. In re Welfare of S.J., 162 Wn. App. 873, 881, 256 P.3d 470 (2011).

## Necessary and Reasonably Available Services

Dimitry contends that the Department failed to offer all necessary and reasonably available services to address her mental health issues. This is so, she argues, because the psychiatric evaluation performed by Dr. Solchany did not include psychological testing or other "rigorous methodology," and therefore did not provide an accurate diagnosis or result in recommendations for appropriately tailored mental health services.[10]

The chief problem with Dimitry's argument is that the psychiatric evaluation does not fall within the definition of a necessary service. A necessary service is a service "'needed to address a condition that precludes reunification of the parent and child.'" In re Matter of K.M.M., 186 Wn.2d 466, 480, 379 P.3d 75 (2016) (quoting In re Dependency of A.M.M., 182 Wn. App. 776, 793, 332 P.3d 500 (2014)). As Dimitry acknowledges, the purpose of the evaluation itself was not to enable reunification, but to direct her toward appropriate services. The mental health treatment that followed from the evaluation, not the evaluation itself, was the service necessary to address a condition precluding reunification.

---

[10] Opening Br. of Appellant at 13.

Here, Dimitry does not identify a mental health or other supportive service that would have been helpful that the Department failed to offer. The service that Dr. Solchany recommended—DBT therapy—was the same service that John Buscher recommended. Buscher's recommendation was independent of Dr. Solchany's diagnosis and was based on Dimitry's own report of her symptoms and prior PTSD diagnosis. Buscher was provided with Dr. Solchany's report at some point and questioned whether her diagnosis of personality disorder not otherwise specified was correct given that she also designated specific types of personality disorders, including narcissistic and oppositional. Nevertheless, his testimony reveals that any disagreement with Buscher's diagnosis was immaterial because he concurred with Dr. Solchany's treatment recommendation. The testimony establishes that DBT is broadly recommended for a "wide range" of disorders with overlapping symptoms, including personality disorder, anxiety disorder, and PTSD, because it is helpful to manage a common array of symptoms.[11]

Moreover, Dimitry's participation in the mental health services that were available to her was minimal and sporadic. Due to her limited participation, she failed to make progress to address her deficiencies—including a pervasive inability to recognize J.J.'s needs and to put those needs above her own— through mental health treatment. It is well-settled that "[w]hen a parent is unwilling or unable to make use of the services provided, [the Department] is not required to offer still other services that might have been helpful." In re

---

[11] 5 RP at 590.

Dependency of T.R., 108 Wn. App. 149, 163, 29 P.3d 1275 (2001). Thus, even assuming that an evaluation that included diagnostic testing might have provided additional diagnoses or insights not discovered in Dr. Solchany's psychiatric evaluation, there is no reason to believe that Dimitry would consistently have participated in any additional services given her failure to avail herself of the mental health services that were offered to her.

Substantial evidence supports the juvenile court's determination that the Department offered all necessary and reasonably available services to Dimitry.

### Expert Testimony

Dimitry contends that the juvenile court abused its discretion in limiting expert witness testimony. Dimitry contends that the court's ruling improperly excluded "critical information about Dr. Solchany's evaluation and methods."[12]

At trial, Dimitry sought to present the expert testimony of psychologist Dr. Daniel Rybicki. Dr. Rybicki had not met or evaluated Dimitry, but was prepared to testify about Dr. Solchany's methodology and the quality of her evaluation. Both the Department and the CASA objected to the proposed testimony on the ground that Dr. Rybicki, a licensed and forensic psychologist, was not qualified to offer an opinion on the methodology of a psychiatric nurse practitioner.

After hearing extensive testimony about Dr. Rybicki's qualifications and expertise, the court took a recess to review respondent's exhibit 79, which Dimitry acknowledged accurately set forth all aspects of Dr. Rybicki's proposed testimony. The court granted the Department's motion to exclude Dr. Rybicki's

---

[12] Opening Br. of Appellant at 22.

testimony, in part, and denied it, in part. The court ruled that Dr. Rybicki, as a "very experienced psychologist," could testify about Dr. Solchany's "Axis II diagnosis issues," specifically with regard to personality disorders and the "catch-all diagnosis" of personality disorder not otherwise specified.[13]

The court allowed Dr. Rybicki to testify about four specific critiques listed on exhibit 79. In particular, the court ruled that Dr. Rybicki could testify about the accuracy of Dr. Solchany's diagnosis, her failure to cite specific examples of behaviors or incidents to validate her clinical impressions, her failure to conduct psychological testing to support the diagnosis, and failure to establish a link between the diagnosis and parental deficits. This ruling excluded Dr. Rybicki's opinions about whether Dr. Solchany's evaluation, conducted in December 2014, was stale, whether she spent a sufficient amount of time conducting the individual interview, whether she took steps to reduce "'confirmatory bias'" or "'observer drift,'" the number of collateral sources she included, and her failure to conduct "structured segments" in her observational sessions.[14]

Under ER 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." In other words, the rule allows an expert to testify about his or her specialized knowledge if it would help the court understand the evidence, but does not require the court to admit proffered expert testimony that is not helpful to the trier of fact. The trial

---

[13] 7 RP at 1003.
[14] Ex. 79.

13

court has broad discretion in determining the admissibility of an expert's testimony. In re Det. of McGary, 175 Wn. App. 328, 339, 306 P.3d 1005 (2013). An abuse of discretion occurs when a trial court's decision is "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). If the basis for the admission or exclusion of expert opinion is fairly debatable, we will not disturb the trial court's ruling. In re Det. of Coe, 160 Wn. App. 809, 818, 250 P.3d 1056 (2011).

The juvenile court thoroughly considered the requirements of ER 702, the expert's qualifications, and the offer of proof in making its ruling. The court allowed a significant amount of testimony from Dr. Rybicki. Dr. Rybicki testified in accordance with the ruling. Contrary to Dimitry's argument, the court allowed Dr. Rybicki's testimony about the "failure to include psychological testing specific to personality disorders."[15] To the extent that the court sustained an objection to testimony about the inadequacies of Dr. Solchany's methodology, the objection pertained to the reference to "collateral source data," which was beyond the scope of the ruling.[16] Dr. Rybicki testified about the accuracy of Dr. Solchany's "grab bag" diagnosis of personality disorder not otherwise specified.[17] He discussed Dr. Solchany's failure to identify "specific behavioral examples" to

---

[15] 7 RP at 1012.
[16] 7 RP at 1013.
[17] 7 RP at 1019-20.

support her diagnosis.[18] He also opined that Dr. Solchany failed to explain how the diagnosis affected Dimitry's ability to safely parent.

The court's ruling limiting Dr. Rybicki's testimony to matters within his expertise as a psychologist was not manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.

We affirm the juvenile court's order terminating the legal relationship between Dimitry and J.J.

_Trickey, J_

WE CONCUR:

_Appelwick, C.J_          _Becker, J._

---

[18] 7 RP at 1021.