IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| ANTONIO HILL, individually; ISAIAH IFANSE, a minor through his mother JENNIFER IFANSE; and ERON KROSS, individually, | ) ) ) ) ) | No. 80233-0-I |
| Appellants/Cross Respondents, | ) ) | DIVISION ONE |
| v. | ) ) | |
| THE WASHINGTON INTERSCHOLASTIC ACTIVITIES ASSOCIATION, a Washington non-profit Corporation, | ) ) ) ) ) | |
| | ) | UNPUBLISHED OPINION |
| Respondent/Cross Appellant, | ) ) | |
| and | ) ) | |
| BELLEVUE SCHOOL DISTRICT NO. 405, a municipal corporation and subdivision of the State of Washington, | ) ) ) ) | |
| Defendant. | ) | |

BOWMAN, J. — A group of former Bellevue High School (BHS) students sued the Bellevue School District (BSD) and the Washington Interscholastic Activities Association (WIAA), alleging that investigations into possible athletic rule violations were negligent and discriminatory contrary to the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW; and the common school provisions of chapter 28A.642 RCW. WIAA argued it was immune from liability under the Washington Act Limiting Strategic Lawsuits Against Public

Participation (anti-SLAPP) statute, RCW 4.24.510. The trial court concluded that immunity did not protect WIAA but dismissed the students' claims on summary judgment. We affirm.

FACTS

WIAA is a nonprofit organization authorized to oversee and administer policies, rules, and regulations for high school interscholastic activities, including athletics, for nearly 800 member schools in Washington. BSD is a member school district of WIAA.

The BHS football program is "one of the most successful . . . in the entire nation." In 2015, BSD asked WIAA to investigate claims of rule violations by the BHS football program that had appeared in a Seattle Times news article. Sources accused the school of improperly recruiting athletes from outside the district and subsidizing their tuition at the Academic Institute Inc.,[1] housing, and athletic training after relocating to the city of Bellevue.[2] WIAA hired two former federal prosecutors experienced with public school district inquiries to investigate the allegations.

The investigators asked BSD to provide a list of transfer students and their records to help focus the investigation. BSD refused, citing the family educational and privacy rights act, 20 U.S.C. § 1232g. Since the investigators were not agents or employees of the school, attorneys for BSD would not disclose the information without parent authorization. The investigators asked

---

[1] The Academic Institute is a small private school within the BSD that does not have an athletics department. Students at a private school without a football team can play for a public school in the same district.

[2] Sources also accused BSD of lenient curriculum requirements for football players.

BSD to commission them as agents to gain access to the records but BSD refused.

Without help from the school, the investigators compiled a list of 42 current and former football players they believed had transferred to BSD between 2008 and 2015. An anonymous source told them that certain players on the list had lied about their addresses so they would be eligible to play football at BHS. An interview with a coach outside the district corroborated the tip. Acting on the information, investigators requested interviews with 9 students. BSD sent a letter to the students' parents and guardians, encouraging them to "support your son meeting with the WIAA investigators to answer their questions" and welcoming the parents' presence at the interviews. The letter clarified that the interviews were voluntary but also that "[a] failure to cooperate may contribute to an adverse inference in the investigative report[,] which may be detrimental to the interests of [BHS] and its football program."

Of the nine students that received interview requests, seven agreed to the interviews—three white students and four students of color. A parent and school administrator was present for each interview. The school administrator and the investigators agreed on the scope of the interviews beforehand. During the interviews, investigators would seek to answer five specific questions:

[1.] Whether coaches directed athletes to attend the Academic Institute
[2.] Whether [the] Booster [Club] had paid tuition of athletes at [the] Academic Institute
[3.] Whether athletes used false addresses to gain eligibility
[4.] Whether athletes received subsidized housing to gain eligibility
[5.] Whether coaches are coordinating tuition payment for athletes.

After the interviews, students Antonio Hill, Isaiah Ifanse, and Eron Kross accused investigators of using aggressive, bullying tones and mannerisms and asking inappropriate questions about socioeconomic circumstances beyond the investigation's scope. Hill and Ifanse also alleged that the investigators targeted them based on their race.[3] The three students filed harassment, intimidation, and bullying complaints with BSD. The district determined that some of the investigators' interview questions exceeded the scope of the investigation but did not rise to the level of harassment, intimidation, or bullying.

The students then filed a complaint for damages in superior court.[4] They alleged BSD and WIAA conducted their investigation negligently. Hill and Ifanse also sought damages for racial discrimination under the WLAD; chapter 28A.642 RCW, the common school provision prohibiting discrimination in public schools; and the right to freedom from discrimination statute, RCW 49.60.030.[5] The complaint sought attorney fees and costs and damages for emotional distress.

BSD and WIAA each filed motions for summary judgment. WIAA argued that the negligence and discrimination claims failed as a matter of law. WIAA also asserted immunity from any liability under RCW 4.24.510.

In opposition to WIAA's motion for summary judgment, the students offered expert testimony from University of North Carolina Greensboro Associate Professor Dr. Steven Cureton. Dr. Cureton has a doctorate in sociology with an emphasis on criminology, family, and race in America. Dr. Cureton used a

---

[3] Hill and Ifanse are black. Kross is white.

[4] Ifanse's mother Jennifer Ifanse was also a named plaintiff.

[5] Plaintiffs also cited the WAC.

process called "content analysis theory," which examines words and word patterns to identify discriminatory themes and resulting adverse symptomology. He applied this analysis to Kross, Hill, and Ifanse's depositions. Dr. Cureton also used "critical race theory" to interpret their depositions. Dr. Cureton concluded that all three students experienced discrimination.

The trial court granted BSD's motion for summary judgment with prejudice and dismissed BSD as a defendant. The court concluded BSD owed no duty to the students because it was not acting in loco parentis[6] at the time of the interviews.[7] The trial court granted in part and denied in part WIAA's motion for summary judgment. It determined that WIAA was not immune under RCW 4.24.510 but dismissed the students' negligence claims because they "failed to meet the objective symptomology requirement to support their claim." Hill and Ifanse's discrimination claims remained.

WIAA then moved to exclude Dr. Cureton's testimony. The trial court granted WIAA's motion, finding that "it would not be helpful" to the trier of fact under ER 702. The court also concluded that "content analysis is not a generally accepted methodology to assess discrimination and its effects" under Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).[8]

---

[6] "The term 'in loco parentis' means, '[i]n the place of a parent; instead of a parent; charged, factitiously, with a parent's rights, duties, and responsibilities.' " Zellmer v. Zellmer, 164 Wn.2d 147, 164, 188 P.3d 497 (2008) (quoting BLACK'S LAW DICTIONARY 787 (6th ed.1990)).

[7] The students do not appeal the dismissal of their claims against BSD.

[8] The Frye standard allows a court to admit scientific evidence only if it is generally accepted in the relevant scientific community. State v. Copeland, 130 Wn.2d 244, 255, 922 P.2d 1304 (1996).

The trial court then dismissed Hill and Ifanse's remaining claims under the WLAD and chapter 28A.642 RCW. The court concluded that "WIAA is not a place of [public] accommodation" under chapter 49.60 RCW and Title 28A RCW did not establish a cause of action against WIAA.

The students appealed. WIAA cross appealed, arguing the trial court erred in dismissing its immunity defense.

ANALYSIS

Anti-SLAPP Immunity

WIAA argues that the trial court "improperly rejected" their immunity defense because the students' allegations "all 'stem from' the investigators' report that WIAA provided to BSD," and the anti-SLAPP statute "immunizes all such claims." The students argue the anti-SLAPP statute does not confer immunity to WIAA because the investigators' conduct was not "based upon"[9] WIAA's communication to BSD.[10] We agree with the students.

We review the grant or denial of an anti-SLAPP motion de novo. Dillon v. Seattle Deposition Reporters, LLC, 179 Wn. App. 41, 70, 316 P.3d 1119 (citing City of Longview v. Wallin, 174 Wn. App. 763, 776, 301 P.3d 45, review denied, 178 Wn.2d 1020, 312 P.3d 650 (2013)), review granted, 180 Wn.2d 1009, 325 P.3d 913 (2014). RCW 4.24.510, also known as the "anti-SLAPP statute," grants

---

[9] See RCW 4.24.510.

[10] The students also argue that WIAA is not a protected "person" under RCW 4.24.510 because it is an entity delegated to act by a government agency. But our Supreme Court recently held in Leishman v. Ogden Murphy Wallace, PLLC, 196 Wn.2d 898, 899, 479 P.3d 688 (2021), that a "government contractor hired to perform an independent investigation is a 'person' " under the anti-SLAPP statute.

immunity from civil liability to a person who reports potential wrongdoing to government authorities.  RCW 4.24.510 states, in pertinent part:

> A person who communicates a complaint or information to any branch or agency of federal, state, or local government, or to any self-regulatory organization that regulates persons involved in the securities or futures business and that has been delegated authority by a federal, state, or local government agency and is subject to oversight by the delegating agency, is immune from civil liability for claims based upon the communication to the agency or organization regarding any matter reasonably of concern to that agency or organization.

The legislature enacted the anti-SLAPP statute to encourage the reporting of potential wrongdoing to governmental entities by protecting reporting parties from the threat of retaliatory lawsuits.  Aronson v. Dog Eat Dog Films, Inc., 738 F. Supp. 2d 1104, 1109 (W.D. Wash. 2010).  The statute recognizes that "information provided by citizens concerning potential wrongdoing is vital to effective law enforcement" and that "the threat of a civil action for damages could be a deterrent to citizens who wish to report such information to law enforcement agencies."  Tham Thi Dang v. Ehredt, 95 Wn. App. 670, 681, 977 P.2d 29 (1999) (citing RCW 4.24.500).

Relying on Tham Thi Dang, WIAA argues that it is immune from liability for any discriminatory conduct by its investigators because the anti-SLAPP statute "extends not only to allegations based expressly on communications to public entities, but also to allegations based on conduct leading to such communications."  In Tham Thi Dang, a bank employee suspected Tham Thi Dang was trying to cash a fraudulent check.  Tham Thi Dang, 95 Wn. App. at 672-73.  The employee reported the suspicions to police, confiscated her

7

identification, and would not let her leave until police arrived to investigate.  Tham Thi Dang, 95 Wn. App. at 674.  The police arrested Tham Thi Dang but later determined the check was not fraudulent and released her.  Tham Thi Dang, 95 Wn. App. at 675-76.

Tham Thi Dang sued the bank for unlawful imprisonment.  Tham Thi Dang, 95 Wn. App. at 676.  The bank claimed immunity under the anti-SLAPP statute and the trial court granted the bank's summary judgment motion.  Tham Thi Dang, 95 Wn. App. at 681.  We affirmed, adopting the reasoning from Hunsucker v. Sunnyvale Hilton Inn, 28 Cal. Rptr. 2d 722, 724-25, 23 Cal. App. 4th 1498 (1994), that "it was indisputable that all the actions out of which the plaintiff's complaint arose were a result of the communication . . . to the police" and "should be encompassed within the scope of the immunity."  Tham Thi Dang, 95 Wn. App. at 684-85.  Allowing a cause of action for the events surrounding the communication to police, while immunizing the communication itself, would thwart the policies and goals underlying the immunity statute.  Tham Thi Dang, 95 Wn. App. at 683.

Similarly, in Leishman, the Washington State Office of the Attorney General (AGO) retained law firm Ogden Murphy Wallace (OMW) to "conduct an independent investigation into Leishman's discrimination complaint [against the AGO] and his supervisor's allegation that Leishman was inappropriate" during their meeting to discuss his complaint.  Leishman, 196 Wn.2d at 901.  OMW reported to the AGO that Leishman had not established discrimination and that

8

his conduct during the meeting " 'violated expected standards of conduct for his position.' " Leishman, 196 Wn.2d at 901. The AGO terminated Leishman.

Leishman sued OMW, arguing that OMW's negligence, negligent misrepresentation, fraud, and discrimination in investigating his discrimination complaint and reporting his conduct during the meeting damaged him. Leishman, 196 Wn.2d at 901-02. Our Supreme Court concluded that OMW was immune from liability under the anti-SLAPP statute because "Leishman's claims regarding OMW's conduct during the investigation are the starting point or foundation of the communication to the government agency, and his damages all stem from that final communication." Leishman, 196 Wn.2d at 910-11.

Unlike Tham Thi Dang's false imprisonment claim stemming from the bank's report that she tried to pass a fraudulent check, or Leishman's termination from employment stemming from OMW's investigatory report, the students' claim of emotional distress does not stem from WIAA's communication to BSD about rule violations. Instead, their claim stems directly from the investigators' misconduct. As a result, the students' claim of emotional distress is not "based upon"[11] WIAA's communication to BSD, and WIAA is not immune from civil liability under the anti-SLAPP statute.[12] The court did not err in rejecting WIAA's immunity defense.

---

[11] RCW 4.24.510.

[12] Nor would immunizing WIAA investigators from liability for racial discrimination and bullying during the course of their investigation further the policies and goals of the anti-SLAPP statute.

Summary Judgment

The students assert the court erred in dismissing their claims against WIAA on summary judgment. We review a trial court's order granting summary judgment de novo. Frisino v. Seattle Sch. Dist. No. 1, 160 Wn. App. 765, 776, 249 P.3d 1044 (2011).

A trial court properly grants summary judgment when, viewing all facts and reasonable inferences in the light most favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Elcon Constr., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 164, 273 P.3d 965 (2012); Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). A defendant can prevail on a motion for summary judgment by challenging the plaintiff's ability to establish an essential element of a cause of action. See Young v. Key Pharm., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). The defendant bears the initial burden of showing a lack of evidence. Young, 112 Wn.2d at 225 n.1. The burden then shifts to the plaintiff to establish the essential elements of their claim. Young, 112 Wn.2d at 225. If the plaintiff does not do so, the defendant is entitled to summary judgment. Young, 112 Wn.2d at 225.

Negligence Claim

The students allege that WIAA negligently inflicted emotional distress on them because its investigators were "aggressive, demanding, and would only take the answer they wanted to hear" when interviewing them as part of their investigation into the BHS football cheating allegations. WIAA claims the

10

students did not show evidence of objective symptomatology necessary to support damages in a claim for negligent infliction of emotional distress. We agree with WIAA.

To prevail on a claim of negligence, plaintiffs must show (1) the defendant owed them a duty, (2) the defendant breached that duty, (3) the plaintiffs suffered an injury, and (4) proximate cause between the breach and the injury. Tincani v. Inland Empire Zoological Soc'y, 124 Wn.2d 121, 127-28, 875 P.2d 621 (1994). Failure to establish any of these essential elements is fatal to the students' claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

To prove negligent infliction of emotional distress, the plaintiffs must establish the same elements necessary for a negligence action. Strong v. Terrell, 147 Wn. App. 376, 387, 195 P.3d 977 (2008). But in deciding whether to allow damages for emotional distress without physical injury,

> Washington courts have balanced the right to compensation for emotional distress against competing interests in preventing fraudulent claims and ensuring that tortfeasors are held responsible only insofar as commensurate with their degree of culpability.

Bylsma v. Burger King Corp., 176 Wn.2d 555, 560, 293 P.3d 1168 (2013).

As a result, we allow claims for emotional distress without physical injury "only where emotional distress is (1) within the scope of foreseeable harm of the negligent conduct, (2) a reasonable reaction given the circumstances, and (3) manifested by objective symptomatology." Bylsma, 176 Wn.2d at 560. "These requirements were developed to address past concerns that feigned claims of emotional distress would lead to 'intolerable and interminable litigation.' "

11

Bylsma, 176 Wn.2d at 560-61[13] (quoting Corcoran v. Postal Tel.-Cable Co., 80 Wash. 570, 580, 142 P. 29 (1914)). Objective symptomology requires that a plaintiff's emotional distress "constitute a diagnosable emotional disorder" and that objective medical evidence proves both "the severity of the distress, and the causal link between the [negligent behavior] and the subsequent emotional reaction." Hegel v. McMahon, 136 Wn.2d 122, 135, 960 P.2d 424 (1998); Haubry v. Snow, 106 Wn. App. 666, 678-79, 31 P.3d 1186 (2001).

Here, the students pleaded a negligence action, claiming only emotional distress as damages. But they offered no evidence showing objective symptomology of that emotional distress. While Hill, Ifanse, and Kross each testified that he suffered sleepless nights, periods of depression, stress, and anxiety, none sought medical intervention or mental health treatment. Nor did they offer a medical diagnosis. Indeed, the students' attorney told the court, "[T]here's emotional aspects to it, but not diagnosable, you know, necessarily PTSD[14] type of harm. We're not going to go there." Instead, the students offered the opinion of Dr. Cureton that the investigators engaged in discriminatory conduct. But Dr. Cureton is not a medical doctor nor a mental health professional and is not able to render a medical or mental health diagnosis. As he candidly admitted, "I don't diagnose anything. . . . I'm not qualified to diagnose mental health symptoms."

---

[13] Internal quotation marks omitted.

[14] Post-traumatic stress disorder.

Because the students offer no evidence that they suffered a diagnosable emotional disorder, they do not satisfy the element of damages necessary to sustain a claim of negligent infliction of emotional distress. The trial court properly dismissed their claim.[15]

WLAD Claim

Hill and Ifanse argue the trial court erred in dismissing their claims against WIAA alleging disparate treatment in violation of the WLAD. We disagree.

The WLAD prohibits "any person or the person's agent or employee [from committing] an act which directly or indirectly results in any distinction, restriction, or discrimination" based on a person's membership in a protected class. RCW 49.60.215. The purpose of the WLAD is to deter and eradicate discrimination in Washington. Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles, 148 Wn.2d 224, 246, 59 P.3d 655 (2002). We construe the WLAD " 'liberally for the accomplishment of the purposes thereof.' " W.H. v. Olympia Sch. Dist., 195 Wn.2d 779, 784, 465 P.3d 322 (2020) (quoting RCW 49.60.020).

To establish a prima facie case of discrimination under the WLAD, a plaintiff must prove that (1) the plaintiff is a member of a protected class,[16] (2) the defendant's establishment is a place of public accommodation, (3) the defendant discriminated against the plaintiff when it did not treat the plaintiff in a manner comparable to the treatment it provides to persons outside that class, and (4) the

_____

[15] Because we conclude that the students did not produce evidence of objective symptomology, we do not reach the remaining elements of their negligence claim. Celotex Corp., 477 U.S. at 322.

[16] The parties agree that Hill and Ifanse are members of a protected class.

13

plaintiff's protected status was a substantial factor that caused the discrimination. Floeting v. Grp. Health Coop., 192 Wn.2d 848, 853-54, 434 P.3d 39 (2019) (citing Fell v. Spokane Transit Auth., 128 Wn.2d 618, 637, 911 P.2d 1319 (1996)).

To establish a disparate treatment discrimination case, a plaintiff must show that the defendant treated some people less favorably than it did others because of their protected status. Alonso v. Qwest Commc'ns Co., 178 Wn. App. 734, 743, 315 P.3d 610 (2013). To overcome summary judgment, a plaintiff need only show that a reasonable jury could find the plaintiff's protected trait was a substantial factor motivating the defendant's adverse actions. Scrivener v. Clark Coll., 181 Wn.2d 439, 445, 334 P.3d 541 (2014). " 'This is a burden of production, not persuasion, and may be proved through direct or circumstantial evidence.' " Scrivener, 181 Wn.2d at 445 (quoting Riehl v. Foodmaker, Inc., 152 Wn.2d 138, 149, 94 P.3d 930 (2004), abrogated on other grounds by Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County, 189 Wn.2d 516, 404 P.3d 464 (2017)).

The liability inquiry focuses on whether actions led to discrimination, not whether the proprietor of a place of public accommodation intended to discriminate. Floeting, 192 Wn.2d at 853.

> "[T]he asserted discriminatory conduct must be objectively discriminatory. By this we mean that it must be of a type, or to a degree, that a reasonable person who is a member of the plaintiff's protected class, under the same circumstances, would feel discriminated against."

Floeting, 192 Wn.2d at 858[17] (quoting Floeting v. Grp. Health Coop., 200 Wn.

---

[17] Emphasis omitted.

App. 758, 773-74, 403 P.3d 559 (2017)).

Hill and Ifanse do not argue that WIAA was wrong to seek them out for interviews. As their attorney argued below, "The interview is not the problem. We're fine with the interview. It's the particular questions at the end of the interview that were discriminatory and harassing." Specifically, Hill and Ifanse accuse WIAA investigators of having a "racist mind-set" against players and families of color. They claim that the transfer list created by the investigators disproportionally included black players and that the investigators subjected players of color to more disparaging questions during their interviews. The record does not support their contentions.

Hill and Ifanse argue that the investigators' initial list of 42 transfer students targeted black players because 35 of the players were people of color, and it is "statistically impossible" that the list proportionately represented the black population in the Bellevue community. But WIAA did not compile its initial list of transfer students from the Bellevue community at large. Because it was investigating allegations of improper recruiting by the BHS football team, investigators used a list of students who had gone through WIAA "eligibility hearings" and the rosters of BHS football players from 2008 through 2015. Hill and Ifanse offer no evidence of the racial composition of those records. And the investigators eventually narrowed the initial list of 42 to only 9 students from whom they requested interviews. Of those 9 players, 4 were white.[18] Hill and

---

[18] Ultimately, seven of those nine students agreed to interviews. Of the seven players, three were white and four were black.

15

Ifanse offer no evidence that the investigators compiled the initial list of transfer students or requested interviews based on race.

Hill and Ifanse next contend that WIAA did not subject white students to belittling questions about their ability to afford living in Bellevue as the black students were. But the record shows that investigators also questioned Kross about why he selected Bellevue, whether his family rented or owned their home, and about his mother's employment. According to Kross, the investigators were also aggressive and disparaging to him. Hill and Ifanse did not produce any testimony from the other two white students interviewed. But the evidence in the record suggests that the investigators asked all of the players similar questions about the same topics regardless of race.[19]

Hill and Ifanse also contend that the investigators questioned black students in more disparaging ways than white students, including asking whether their parents cared for them, using aggressive tones, and not accepting answers they did not like.[20] According to Hill, investigators asked his mother whether she cared about him and whether she talked to him. But the record shows that Hill's mother was absent from the state for long periods of time for military service. So it does not follow that race was a substantial factor motivating the investigators to ask those questions. And only Kross claimed investigators threatened he would suffer adverse consequences if he spoke his opinions publicly that the

---

[19] WIAA provided the investigators' notes from the three interviews of the white players. The notes reflect questions about living arrangements, how they financed gym training, and recruiting inducements.

[20] The investigators insisted they maintained a professional and polite demeanor during the interviews.

investigation was racially biased.  None of the students of color reported similar threats.

The record shows that nearly everyone who interacted with the WIAA investigators complained that they were rude and unnecessarily aggressive. Representatives from BSD complained the investigators launched unfounded accusations and threats against them if they did not agree to the investigators' demands.  But none of those complaints included concerns that the investigators asked racially motivated questions or that they treated people differently based on their race.  And Hill and Ifanse produced no evidence in support of their allegation that the investigators were disproportionately rude and aggressive toward them because of their race.  The trial court did not err in dismissing their claim under the WLAD.[21]

<u>Exclusion of Dr. Cureton's Testimony</u>

Hill and Ifanse contend the trial court erred by excluding their expert witness because his testimony would not help the jury under ER 702 and his content analysis theory was not a generally accepted methodology to assess

---

[21] Because the students do not establish disparate treatment, we do not address the remaining elements of their WLAD claim, including whether we should consider WIAA a place of public accommodation.  Hill and Ifanse also asserted a discrimination claim under chapter 28A.642 RCW, the common school provision prohibiting discrimination in public schools.  WIAA claims that Title 28A RCW does not apply to the students' private cause of action.  Because we conclude Hill and Ifanse fail to establish facts sufficient to show discrimination, we do not reach that issue.

discrimination and its effects. We disagree.[22]

We review evidentiary rulings for abuse of discretion. In re Det. of McGary, 175 Wn. App. 328, 337, 306 P.3d 1005 (2013) (citing State v. Lormor, 172 Wn.2d 85, 94, 257 P.3d 624 (2011)). The trial court has broad discretion in determining whether an expert's testimony is admissible under ER 702. McGary, 175 Wn. App. at 339. ER 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

To admit expert testimony under ER 702, the trial court must determine that the witness qualifies as an expert and that the testimony will assist the trier of fact. Lakey v. Puget Sound Energy, Inc., 176 Wn.2d 909, 918, 296 P.3d 860 (2013).

Expert testimony assists the trier of fact under ER 702 if it helps the jury in understanding matters outside the competence of ordinary lay persons. Anderson v. Akzo Nobel Coatings, Inc., 172 Wn.2d 593, 600, 260 P.3d 857 (2011) (citing Reese v. Stroh, 128 Wn.2d 300, 308, 907 P.2d 282 (1995)). And the testimony must be relevant to a fact at issue. State v. Greene, 139 Wn.2d 64, 73, 984 P.2d 1024 (1999) (citing State v. Riker, 123 Wn.2d 351, 364, 869 P.2d 43 (1994)). Scientific evidence that does not help the trier of fact resolve

---

[22] WIAA asserts the students did not timely appeal the trial court's order excluding Dr. Cureton's testimony under RAP 5.2. The students assert RAP 2.2(a)(13) allows them to appeal the order. The students' initial notice of appeal designated the trial court's summary judgment orders dismissing their various claims but did not specifically designate the trial court's order excluding Dr. Cureton's testimony. Months later, the students filed an amended notice of appeal, designating the order excluding Dr. Cureton's testimony for the first time. We conclude the order excluding testimony is sufficiently related to the dispositive orders on summary judgment to merit review. See RAP 2.4(b); Right-Price Recreation, LLC v. Connells Prairie Cmty. Council, 146 Wn.2d 370, 378-81, 46 P.3d 789 (2002).

any issue of fact is irrelevant and does not meet the requirements of ER 702.

Greene, 139 Wn.2d at 73.

Hill and Ifanse contend that Dr. Cureton's testimony was relevant to show that the WIAA investigators subjected them to racially motivated, disparate treatment. It is true that Dr. Cureton concluded that the WIAA investigators engaged in disparaging and humiliating conduct. But he also concluded that all three players, regardless of their race, "were exposed to bullying, intimidation and harassment ruthlessness and; therefore, equally shared in the humiliation, dehumanization and personhood negation." For example, Dr. Cureton concluded:

> Relentlessly bombarding student-athletes [Kross], [Hill] and [Ifanse] with rhetorical questions, accusatory statements and questions with pre-determined answers served the purpose of embarrassing, humiliating and intimidating plaintiffs and their mothers. . . .
> . . . .
> BSD and WIAA effectively dispossessed [Kross], [Hill] and [Ifanse] of counter-acting forces that would protect them from the abusive line of questions, investigative tactics, gestures and threats issued by [the investigators]. In short, BSD discriminated against [Kross], [Hill] and [Ifanse] because BSD failed to protect student-athletes the same way they protected district employees. WIAA discriminated against [Kross], [Hill] and [Ifanse] because WIAA empowered and positioned [the investigators] to levy an unjust and discretionary methodology that resulted in the dehumanization, belittling, and intimidation of [the three students and their mothers]. . . .
> [ ]
> . . . In my professional opinion, BSD and WIAA are equally complicit in discrimination by allowing [the investigators'] tactics to be forced on Kross, Hill and Ifanse. Such tactics were oppressive, maligning, alienating, marginalizing, culturally imposing, exploitive, and power dynamic co-optation.
> . . . .
> . . . Kross, Hill and Ifanse have suffered and will continue to experience the lifelong effects of being the subject of discrimination in this setting.

19

These conclusions do not reflect different treatment toward the families of color. And Dr. Cureton did not contend that race motivated any differences in the phrasing of the investigators' questions. To the contrary, Dr. Cureton found that all three players and their families "equally" suffered harassment by the investigators, who abused their position of power over student athletes to bully them into submission. The trial court did not abuse its discretion when it determined Dr. Cureton's testimony would not help the trier of fact.[23]

In sum, the trial court properly denied WIAA's claim of immunity and did not abuse its discretion in excluding Dr. Cureton's testimony. Because the students did not show objective symptomology of emotional distress or that racial motivation caused investigators to treat them disparately, the trial court did not err in dismissing their negligence and discrimination claims on summary judgment.

Affirmed.

_____
Brunner, J

WE CONCUR:

_____          _____
Coburn, J.                                                   Verellen, J

---

[23] Because we hold that Dr. Cureton's testimony did not help the trier of fact under ER 702, we do not reach whether "content analysis theory" satisfies the Frye standard.